(91 South. 207)

No. 22916.

FROST–JOHNSON LUMBER CO. v. SALLING'S HEIRS et al.

(Jan. 5, 1920. On Rehearing, May 2, 1921. On Second Rehearing, Feb. 17, 1922.)

On Original Hearing.

*(Syllabus by the Court.)*

1. **Libel and slander** ⊂⊃130—**Owner may sue any one claiming real right on the land for slander of title.**

A person in possession as owner of land has a right of action for slander of title against one who claims a right to the minerals in or under the land, or who claims any real right upon the land.

2. **Libel and slander** ⊂⊃140—**In slander of title, when the question of possession depends on legal conclusion from title construction, it is relegated to merits, or passes out of case.**

When the question of possession, in a jactitation suit, depends, not upon actual occupancy or physical possession, but upon a legal conclusion to be derived from a proper construction of the titles, the question of possession is relegated to the merits of the case, or passes out of it.

3. **Mines and minerals** ⊂⊃55(5)—**Reservation held only to reserve a servitude regarding oil and gas.**

A contract of sale of a tract of land, in which the seller excepts and reserves unto himself "all minerals, coal, fossils, and precious stones, * * * together with all mining rights connected therewith; * * * also * * * the exclusive right and privilege to enter upon the lands * * * and bore and explore for gas and oil, and to utilize the gas and oil that may be found or discovered upon said lands," while purporting to reserve the ownership or physical property in the solid minerals, such as coal, fossils, and precious stones, does not purport to reserve the ownership of the oil or gas itself, but purports to reserve only a real right or servitude upon the land, with regard to the oil and gas.

4. **Mines and minerals** ⊂⊃55(4)—**Right to take oil and gas from land does not constitute a joint ownership with title owner, but a servitude.**

According to articles 488 and 494 of the Civil Code of Louisiana, it is of the very es-

sence of the definition or right of ownership that two or more persons cannot have a joint ownership of corporeal property, unless their respective shares or interests in it are fixed or determinable. If each one of several persons has the right to take and appropriate to his own use, freely and without having to compensate the others, as much as he desires to take of the oil or gas in or under a defined area of land, the right of each of the parties is not joint ownership of the oil or gas, but is a real right or servitude upon the land.

### 5. Mines and minerals ⬅⟐55(7)—Contract to sell oil and gas under land, or sale reserving them, held to convey servitude, lost by prescription, if not exercised in 10 years.

Mineral oil and gas, while at large beneath the surface of the land, or supposed to be there, are not subject to ownership, as physical or corporeal property. A contract by which the owner of a tract of land undertakes to sell the mineral oil and gas beneath the surface, or supposed to be there, or sells the land and undertakes to reserve to himself the ownership of the mineral oil and gas beneath the surface, or supposed to be there. does not convey or reserve a separate ownership of the mineral oil or gas, but conveys or reserves an incorporeal right, a real right or servitude, upon the land, which right or servitude is lost or extinguished by prescription, if it be not exercised within 10 years, according to articles 789, 3529, and 3546 of the Civil Code of Louisiana.

#### On First Rehearing.

*(Syllabus by Monroe, C. J.)*

### 6. Interpretation of contract.

Where a contract is entered into, and to be executed in this state, concerning the title to immovable property here situated, and the conformity to the Constitution of the United States of the state law relating thereto is undisputed, it will be interpreted in accordance with that law; and the decisions of courts of other jurisdiction based upon other and different laws are irrelevant to such interpretation.

### 7. Prescription against servitude.

Article 789 of the Civil Code, establishing a prescription of 10 years, liberandi causa, against a right of servitude, for nonuser during that period, has no application to the servitude imposed upon the upper, in favor of the lower, estate, in the case of an exception and reservation from a sale of land, of minerals and mining rights, which rights are governed in that respect by Civ. Code, arts. 795 and 753.

### 8. Reservation of minerals.

Where lands in this state are sold, "excepting and reserving * * * all minerals, coal, fossils and precious stones, in, upon or underneath the lands, * * * together with all mining rights connected therewith, including the right to enter upon * * * described lands, prospect for, dig and remove any and all minerals and precious stones, * * * with the right to use so much of the * * * surface * * * as may be necessary for such purposes; also excepting and reserving * * * the exclusive right and privilege to enter upon the lands, * * * or any part thereof, and bore, explore for gas and oil, and to utilize and sell gas and oil that may be found * * * upon said lands, and to use such portions of the surface of said lands as may be necessary to carry on or conduct their oil and gas operations on said lands, and to carry and convey away from said lands such gas and oil," the exception and reservation of "all minerals" will be held to include ownership of all oil and gas, and the exception and reservation of the right and privilege of entering upon the lands and mining and disposing of those minerals will be held to be as intimately and grammatically connected with the antecedent exception and reservation of the ownership of all minerals as is the exception and reservation of such rights with respect to solid minerals.

### 9. Issues not pleaded.

Courts are not at liberty to decide cases upon issues which are raised only in argument and which irreconcilably conflict with those presented by the pleadings.

### 10. Reservation of minerals.

The exception and reservation from a sale of immovable property of all minerals and all mining rights connected therewith, including the rights to enter and "dig," and to enter and "bore" is not a mobilization of the minerals, but is a transaction in immovable property which creates two estates and establishes a servitude upon the surface, or area in favor of the underground or trefond.

#### On Second Rehearing.

*(Syllabus by the Court.)*

### 11. Courts ⬅⟐89—Opinion is authority only in so far as ratio dicendi is necessary for deciding precise issue involved.

The opinion of a court is authority only in so far as the ratio dicendi is necessary for the decision of the precise issue involved in the case.

**12. Mines and minerals ☞48, 55(2)—Oil and gas in place 'not subject to absolute ownership apart from soil; grant or reservation of oil and gas carries only the right to extract them from the soil.**

It is the settled jurisprudence of this state that oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which they form part; and a grant or reservation of such oil and gas carries only the right to extract such minerals from the soil.

**13. Mines and minerals ☞55(7)—Right to extract oil and gas from another's land is a "servitude" prescribed by nonuser for 10 years.**

The right to extract oil and gas from the land of another is a "servitude," and is prescribed by nonuser for 10 years.

[Ed. Note.—For other definitions. see Words and Phrases, First and Second Series, Servitude.]

Provosty, C. J., and Land and Baker, JJ., dissenting.

Appeal from Twelfth Judicial District Court, Parish of De Soto; John H. Boone, Judge.

Suits by the Frost-Johnson Lumber Company against the Heirs of Lottie A. and Ernest N. Salling and others were tried together. Judgment for defendants overruling plaintiff's plea of prescription and rejecting plaintiff's demand in each case, and plaintiff appeals. Judgments annulled, and decree entered determining the parties' rights.

Thigpen & Herold, of Shreveport, and Elmore P. Lee, of Mansfield, for appellant.

Stubbs, Theus, Grisham & Thompson, of Monroe, for appellees Heirs and Legal Representatives of Lottie A. and Ernest N. Salling.

Hampden Story and Foster, Looney & Wilkinson, all of Shreveport, for appellee Atlas Oil Co.

Carroll & Carroll, of New Orleans, Wise, Randolph, Rendall & Freyer, of Shreveport, Hudson, Potts, Bernstein & Sholars, of Monroe, Scarborough & Carver, of Natchitoches, McCoy & Moss, of Lake Charles, and Spencer, Gidiere, Phelps & Dunbar, of New Orleans, amicus curiæ.

## The Pleadings.

O'NIELL, J. Plaintiff, being the owner in possession of a large tract of land in the parish of De Soto, brought three jactitation suits against parties who claim ownership of the mineral oil and gas beneath the surface of the land and claim the right to enter upon the land and bore and explore for oil and gas. The complaint, in substance, is that the. claim of each defendant is in its nature the assertion of a real right upon the land, and is therefore a slander of plaintiff's title.

The heirs and legal representatives of the deceased Ernest N. Salling and of his deceased wife, Lottie A. Salling, were made defendants in all three suits; the allegation being that they claimed ownership of the mineral oil and gas in and under the land, and had granted a mining lease of the property to the Consolidated Petroleum Corporation, of Wilmington, Del., to bore and explore for oil and gas. The Consolidated Petroleum Corporation was made codefendant in the first suit for having recorded the contract of lease from the Salling heirs. In the second suit one T. J. Lawrence was made codefendant for having obtained and recorded an assignment from the Consolidated Petroleum Corporation of the contract of lease from the Salling heirs. In. the third suit the Atlas Oil Company, of Chicago, Ill., was made codefendant for having obtained and recorded an assignment from T. J. Lawrence of the contract of lease that he had acquired from the Consolidated Petroleum Corporation.

In the petition in each suit plaintiff expressly reserved the right to make appropriate answer in the event the defendants should convert the suit into a petitory action by asserting title to the gas or oil, or mineral rights.

Each of the defendants pleaded that the

plaintiff was not in actual physical possession of the mineral rights, or the oil, gas or other minerals in the land, and therefore had no right to maintain the action for slander of title. Reserving the benefit of the plea, each defendant answered, denying that plaintiff owned any oil, gas or other mineral in the land, and alleging that all of the minerals were expressly reserved from the sale of the land by Ernest N. Salling and his wife to plaintiff's grantors of the land.

In answer to defendants' assertion of title to the oil and gas, in each suit, plaintiff pleaded the prescription of 10 years, liberandi causa, alleging that the reservation referred to, in the deed by Ernest N. Salling and his wife to plaintiff's grantors, was not a reservation of ownership of the mineral oil and gas itself, but the reservation of a real right, which, not having been exercised during 10 years, was forfeited by nonuser and lost by prescription.

The three suits were consolidated by consent of all parties. Defendants' exceptions to plaintiff's want of possession of the oil and gas and plaintiff's pleas of prescription were referred to the merits, by consent of all parties, without prejudice to either party, or waiver of either plea.

The suits having been tried together on the issues thus presented, judgment was rendered in favor of the defendants, overruling plaintiff's plea of prescription and rejecting plaintiff's demand in each case.

Plaintiff, prosecuting this appeal, relies only upon the plea of prescription liberandi causa.

It is conceded that these suits pertaining to the oil and gas, if any there be, in or under plaintiff's land, do not involve, and shall not determine or affect, the ownership of any other mineral in or under the land.

### The Facts.

Ernest N. Salling and wife, being the owners of the property in fee simple, sold the land to E. W. Frost and E. A. Frost, on the 2d of July, 1903, with this reservation (preceding the description of the land), viz.:

"Excepting and reserving unto the first parties [Ernest N. Salling and Lottie A. Salling], however, all minerals, coal, fossils and precious stones, in, upon or underneath the lands below described, together with all mining rights connected therewith, including the right to enter upon below-described lands, prospect for, dig and remove any and all minerals and precious stones, in, upon or contained in said lands, with the right to use so much of the said surface of said lands as may be necessary for such purposes; also excepting and reserving unto the first parties the exclusive right and privilege to enter upon the lands below described, or any part thereof, and bore, explore for gas and oil, and to utilize and sell gas and oil that may be found or discovered upon said lands, and to use such portions of the surface of said lands as may be necessary to carry on or conduct their oil and gas operations on said lands, and to carry and convey away from said lands such gas and oil."

Thereafter E. A. Frost and E. W. Frost organized the corporation styled Frost-Johnson Lumber Company, plaintiff in these suits; and, on the 14th of June, 1909, they sold the property to the corporation, without any reservation or exception, and without mention of any previous reservation or exception, of any minerals or mineral rights. E. A. Frost, however, was president of the corporation, and E. W. Frost was a stockholder.

Ernest N. Salling and wife having died, their heirs and legal representatives, on the 13th of February, 1917, made a grant of a mining lease on the property to the Consolidated Petroleum Corporation. The latter assigned the lease, on the 7th of March, 1917, to T. J. Lawrence, who, on the same day, assigned the lease to the Atlas Oil Company.

In April, 1917, the Atlas Oil Company erected a derrick on the land and began boring for oil and gas; whereupon these suits were brought to test the claim of the Salling heirs and their transferees.

No attempt had been made by or on behalf

of Ernest N. Salling or his wife, or their heirs or legal representatives, or by or on behalf of any one claiming title from them, to exercise any mineral right reserved from the sale to E. W. Frost and E. A. Frost, until the Atlas Oil Company began operations, 13 years and 9 months after the sale of the land. In the meantime E. W. Frost and E. A. Frost and their transferee, the Frost-Johnson Lumber Company, had been continuously in physical possession of the land, as owners, paying taxes upon it, felling and removing the timber, and exercising all such rights of ownership, undisputed.

### Opinion.

The question of plaintiff's possession of the oil and gas in or under the land, or of possession of the right to take whatever oil or gas might be in or under the land, was properly referred to the merits of the case, because that question, as presented by the pleadings, did not depend upon physical possession of the oil or gas separately or apart from the land itself, but depended upon plaintiff's right to the oil and gas as owner in possession of the land. The prescription relied upon by plaintiff being liberandi causa, not acquirendi causa, the question presented by the plea of prescription is not whether plaintiff has acquired by prescription any right to the oil or gas, but whether defendants have lost by prescription, or by nonuser during the period of 10 years, whatever rights Ernest N. Salling and his wife reserved with regard to the oil and gas. And the answer to that question depends upon a proper construction of the titles of the parties, respectively.

[1, 2] A person in possession as owner of land has a right of action for slander of title against any one who claims a right to minerals in or under the land, or who claims any real right upon the land. See Wilson v. Pierson, 143 La. 287, 78 South. 561, and De Moss v. Sample, 143 La. 243,

78 South. 482. And it is well settled that, when the question of possession, in a jactitation suit, does not depend upon actual occupancy or physical possession, but depends upon a legal conclusion to be derived from a proper construction of the titles, the question of possession is relegated to the merits of the case, or passes out of it; for it would be a begging of the question, in such case, to attempt to decide the question of possession as a preliminary or an independent question. See Perry v. Board of Commissioners of Caddo Levee District, 132 La. 415, 61 South. 511, and Slattery v. Arkansas Natural Gas Co., 138 La. 793, 70 South. 806.

[3] As the ownership of corporeal property is never lost or forfeited by prescription liberandi causa, a decision of this case depends upon whether Mr. and Mrs. Salling reserved title to the oil and gas itself, if any there was, in or under plaintiff's land, or reserved merely a real right with regard to the oil and gas.

Plaintiff contends that what Mr. and Mrs. Salling reserved was, not ownership of the oil or gas itself, but a servitude in favor of the grantors of the land. Plaintiff therefore invokes article 789 of the Civil Code, viz.:

"A right to servitude is extinguished by the nonusage of the same during ten years."

Plaintiff contends, too, that, even if the right reserved by Mr. and Mrs. Salling should not be considered a servitude, as defined in the Civil Code, it was a real right or obligation in their favor imposed upon the land, and that all real rights and obligations are extinguished by the prescription of 10 years, liberandi causa.

Article 3528 of the Code declares:

"The prescription which operates a release from debts, discharges the debtor by the mere silence of the creditor during the time fixed by law, from all actions, real or personal, which might be brought against him."

And article 3529 declares:

"This prescription has also the effect of releasing the owner of an estate from every species of real rights, to which the property may have been subject, if the person in possession of the right has not exercised it during the time required by law."

Article 3549 declares:

"In cases of prescription releasing debts, one may prescribe against a title created by himself: that is, against an obligation which he has contracted."

The words "debt" and "obligation," as used in these articles of the Code, are synonymous terms. See article 3556, No. 20 and No. 21.

Article 3544 (in the section treating of the prescription which operates a release from debt) declares:

"In general, all personal actions, except those before enumerated, are prescribed by ten years."

Then follows article 3546, repeating, in substance, article 789, viz.:

"The rights of usufruct, use and habitation and servitudes are lost by nonuse for ten years."

Therefore, if the right reserved by Mr. and Mrs. Salling was, not ownership of whatever oil and gas there was or might have been under plaintiff's land, but a servitude or real obligation imposed upon the land in favor of Mr. and Mrs. Salling and their heirs and assigns, the right has been "lost by nonuse for ten years."

Referring to the language of the instrument quoted above, it appears that the parties to the contract did not consider the mineral oil and gas in the class with solid minerals, coal, fossils and precious stones. For the instrument contains two distinct reservations; the first being a reservation of "all minerals, coal, fossils and precious stones," and the second being a reservation of "the exclusive right and privilege to enter upon the lands and bore, explore for gas and oil, and to utilize and sell gas and oil that may be found or discovered upon said lands, and to use such portions of the surface of said lands as may be necessary to carry on or conduct their oil and gas operations on said lands, and to carry and convey away from said lands such gas and oil."

It is not necessary to decide whether, if there were no clause relating particularly to gas and oil, the generic term "minerals," in the first reservation, would include the fugitive minerals, oil and gas; or whether the term "minerals," followed immediately by the words "coal, fossils and precious stones," would mean only minerals ejusdem generis, as coal, fossils and precious stones—solid minerals, or minerals in place. For the effect of this contract, like all other contracts, for that matter, is to be determined by the understanding and intention expressed in the contract. The contracting parties expressed quite plainly their understanding and meaning to be that, though they could reserve the ownership of coal, fossils and precious stones, and of all minerals in place, or solid minerals, in the land they conveyed, they did not have, and could not reserve, the ownership of the fugitive minerals, oil and gas, that might be in or under the land. Hence, with regard to coal, fossils and precious stones, and all "minerals," within their understanding of the term, the grantors of the land reserved the ownership of those minerals, "together with all mining rights connected therewith, including the right to enter upon the land, prospect for, dig and remove any and all minerals and precious stones upon or contained in said lands"; but, with regard to the fugitive minerals, gas and oil, the grantors did not attempt to reserve the ownership of them, but reserved "the exclusive right and privilege to enter upon the lands and bore and explore for gas and oil, and to utilize and sell the gas and oil that might be found or discovered upon said lands, and to use such portions of the surface of said lands as might be necessary to

carry on or conduct their oil and gas operations on said lands, and to carry and convey away from said lands such gas and oil."

[4] Our opinion is that the idea which the parties to the contract expressed so plainly with regard to fugitive minerals, oil and gas, was correct; that the fugitive minerals, oil and gas, if any there were within or under the land conveyed, were, in their very nature, not such as could be reserved in absolute ownership. That is not an abstract proposition of law, or a matter of metaphysical reasoning; it is a fact.

"Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons." Rev. Civ. Code, art. 488.

"It is of the essence of the right of ownership that it cannot exist in two persons for the whole of the same thing; but they may be the owners of the same thing in common, and each for the part which he may have therein." Rev. Civ. Code, art. 494.

It cannot be said with reason that the owner of a tract of land (particularly if it be not known to have oil or gas beneath its surface) has that right by which the oil or gas (if any there be in the land) "belongs to some one in particular [the owner of the land] to the exclusion of all other persons."

The right, which is now universally recognized, of every landowner to extract, by boring wells on his own land, and appropriate to his own use, without compensation to his neighbor, the oil or gas in a natural reservoir beneath the surface, extending beyond his property line, is not consonant with the right of "ownership" (as that right is defined in the Code) of the fugitive minerals, oil and gas, running at large beneath the surface.

In the leading case on the subject (Ohio. Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 730) was presented the question of constitutionality of a statute of Indiana, making it a penal offense for any one having possession or control of a gas well or an oil well to allow the gas or oil to escape for a longer period than two days after having struck gas or oil in the well. The state of Indiana, through the Attorney General, filed a complaint against the Ohio Oil Company, in the circuit court of Madison county, Ind., and obtained a temporary injunction restraining the defendant from permitting the natural gas which was escaping from five of its oil and gas wells to escape into the open air. The defendant demurred, saying that the complaint did not disclose a cause of action. The demurrer was overruled; and defendant, answering the complaint, alleged that the mineral oil and natural gas beneath the surface of the land were the property of the owner of the land, even before such oil and gas were reduced to possession or brought under control by the owner of the land, and that therefore an enforcement of the statute, which undertook to control the owner of mineral oil and gas in the manner of disposing of his property, would be a taking of his property without adequate compensation, and would deprive him of his property and liberty without due process of law, in violation of the Fourteenth Amendment. To this answer the state demurred, saying that the facts alleged in the answer were not sufficient to constitute a defense. The state's demurrer was sustained, and, on defendant's refusal to answer further, a decree was entered, making the injunction permanent. On appeal to the Supreme Court of Indiana, the decree of the circuit court was affirmed, and the defendant brought the contest before the Supreme Court of the United States on a writ of error.

The Supreme Court of the United States found that the question of constitutionality of the statute depended mainly, if not entirely, upon the question whether the fugitive minerals, oil and gas, while running at large beneath the surface of the land, could be the subject of private ownership. The

Chief Justice, for the court, stated and answered the proposition thus:

"The proposition, then, which denies the power in the state to regulate by law the manner in which the gas and oil may be appropriated, and thus prevent their destruction, of necessity involves the assertion that there can be no right of ownership in and to the oil and gas before the same have been actually appropriated by being brought into the possession of some particular person. But it cannot be that property as to a specified thing vests in one who has no right to prevent any other person from taking or destroying the object which is asserted to be the subject of the right of property."

The test which the court then applied in determining whether the fugitive minerals, oil and gas, while running at large beneath the surface of the earth, could be the subject of private ownership, was the definition of ownership, substantially as it is written in the Civil Code of Louisiana (article 488), viz.:

"Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons."

And the court concluded that mineral oil and gas, while running at large beneath the surface of the earth, did not, and in their very nature could not, except perhaps by a legislative fiction, "belong to some one in particular, to the exclusion of all other persons." That, of course, is what "ownership" means universally. See Am. & E. Enc., and Bouvier, verbo "Ownership," and Cyc. verbo "Owner."

Applying that test, and reviewing the decisions of the Supreme Court of Indiana and of other states and of the United States, "without pausing to weigh the reasoning of the opinions of the Indiana court to ascertain whether they in every respect harmonized," the court concluded that the decisions of the Indiana court were "in accord with the general law," and settled the rule of property in the state of Indiana to be as follows:

"Although in virtue of his proprietorship the owner of the surface may bore wells for the purpose of extracting natural gas and oil,

150 LA.—25

until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession. It is also clear from the Indiana cases cited that, in the absence of regulation by law, every owner of the surface within a gas field may prosecute his efforts and may reduce to possession all or every part, if possible, of the deposits without violating the rights of the other surface owners."

The decisions of this court are also "in accord with the general law" that the fugitive minerals, oil and gas, while at large beneath the surface of the earth, are not, and in their very nature cannot be, the subject of private ownership, as defined in the Civil Code.

The question was first presented to this court in the case of Wadkins v. Atlanta & Shreveport Oil Company, No. 19315 (decided in 1913); and it was held, in an opinion written by the then Chief Justice and concurred in by the present Chief Justice and one of the present Associate Justices, that the reservation of the oil, gas and mineral deposits, in an act of sale of the land, was the reservation, not of the ownership of the mineral oil and gas themselves, but of a servitude or real right upon the land, in favor of the seller of the land, and that the servitude was lost by the prescription of 10 years. The decision was not published officially, because a rehearing was granted, and while pending on rehearing the suit was settled by agreement of the parties. The decision, however, has been cited with approval, and as authority, by this court several times, and has never been overruled or disapproved.

In the case of Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623, citing Wadkins v. Atlanta & Shreveport Oil & Gas Co., and decisions of the courts of other states, in support of the proposition, it was said:

"Oil and gas while in the earth are not the

subject of ownership distinct from the soil; and a grant of the oil and gas therefore is a grant, not of the oil or gas that is in the ground, but of such part as the grantee may find, and passes nothing except the right to explore for the same under the terms of such contract."

In the case of Cooke v. Gulf Refining Co., 135 La. 616, 65 South. 758, it was said:

"That oil and gas in their natural state, under the surface of the ground, are not owned by the owner of the land, is held in a long line of decisions. Wadkins v. Atlanta & Shreveport Oil & Gas Co. (No. 19315, not for publication); Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623; Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304; Westmoreland Co. v. De Witt, 130 Pa. 235, 18 Atl. 724, 5 L. R. A. 731."

The doctrine stated in Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623, that oil and gas beneath the surface of the earth are not subject to private ownership, was quoted again with approval in Elder v. Ellerbe, 135 La. 995, 66 South. 337.

In the case of Strother v. Mangham, 138 La. 437, 70 South. 426, it was held that a contract of sale purporting to "grant, bargain, sell, convey and deliver all of the oil and gas" under a tract of land belonging to the vendor and described in the deed, conveyed, not the oil and gas themselves, but only "the right to the oil and gas that might be found and reduced to possession." The vendor in that case brought suit to annul the contract of sale, alleging that the oil and gas beneath the surface of the land were not susceptible of ownership separate and apart from the land itself. Admitting the correctness of the plaintiff's contention, but denying the consequence claimed, this court said:

"The doctrine that the owner of the land has no property right in the oil and gas beneath the surface until he has reduced it to possession in no manner denies to such owner the exclusive right to the use of the surface for the purposes of such reduction, or for any other purpose not prohibited by law, but, to the contrary, concedes that right, as inherent in the title to the land, and subject only to the control of the state, in the exercise of its police power; and the right may be sold, as may any other right, and may carry with it the right to the oil and gas that may be found and reduced to possession."

In Strother v. Mangham, supra, the court again cited with approval the decision in Rives v. Gulf Refining Co. and Ohio Oil Co. v. Indiana, in support of the doctrine that a contract purporting to sell the oil and gas beneath the surface of the earth conveys, not ownership of the oil and gas themselves, but only a real right upon the land, to explore and drill for oil and gas, and to become the owner of the oil and gas that may be found and reduced to possession.

In Saunders v. Busch-Everett Co., 138 La. 1060, 71 South. 163, the Chief Justice, for the court, affirmed the doctrine of all preceding cases in these vigorous terms, viz.:

"It has been held by this court, after mature deliberation (and we find no reason for changing our opinion), that:

" 'Oil and gas while in the earth are not the subject of ownership distinct from the soil; and the grant of the oil and gas therefore is a grant, not of the oil or gas that is in ground, but of such part as the grantee may find, and passes nothing except the right to explore for the same under the terms of such contract.' Rives et al. v. Gulf Refining Co. of La., 133 La. 178, 62 South. 623.

"In the more recent case of Strother v. Mangham, 70 South. 426, ante, p. 437, No. 21436 of the docket of this court, it was said:

" 'The doctrine that the owner of the land has no property right in the oil or gas beneath the surface until he has reduced it to possession in no manner denies to such owner the exclusive right to the use of the surface for the purposes of such reduction, or for any other purpose not prohibited by law, but, to the contrary, concedes that right, as inherent in the title to the land, and subject only to the control of the state, in the exercise of its police power; and the right may be sold, as may be any other right, and may carry with it the right to the oil and gas that may be found and reduced to possession.' "

In the case of Hanby v. Texas Company, 140 La. 194, 72 South. 933, it was held that

a sale of an interest in the oil and gas beneath the surface of a particular tract of land conveyed no title to the oil or gas, but conveyed merely the right to make use of the surface of the land for the reduction to possession of the oil and gas that might be found; and that the reason why the oil and gas themselves could not be sold by the owner of the land was that he himself had not ownership of the oil and gas, but had merely the right to bore and explore for oil and gas and to become the owner of, by reducing to possession, such oil and gas as might be found.

In the case of Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 South. 206, 5 A. L. R. 411, it was said:

"An owner of land does not own the fugitive oil beneath it, and cannot complain that it is being drawn off by a pump sunk by an adjoining landowner."

The appellees here rely upon some rather loose expressions found in the opinion in the case of De Moss v. Sample, 143 La. 243, 78 South. 482, and repeated in the opinion in Calhoun v. Ardis, 144 La. 311, 80 South. 548; in which cases, there being no contention that the fugitive minerals, oil and gas, were subject to private ownership, the court used the expression "minerals" as if it were synonymous with "mineral rights." But the question of the right of ownership of mineral oil and gas not reduced to possession was *not decided in either of those cases;* and it could not have been decided, because it was not an issue in either case. In each case the question was, simply and solely, whether a grantor of land could validly reserve to himself the mineral rights, not whether the grantor of the land could reserve absolute ownership of the fugitive minerals, oil and gas, or could reserve only a real right with regard to those minerals.

In the De Moss Case the reservation made by the grantor of the land was of "the oil, gas and mineral rights in and to the said described property, with the right of ingress and egress," etc. It was not decided, nor contended, for that matter, that the words "oil" and "gas" were not, like the word "mineral," mere adjectives, describing the "rights" that were reserved by the grantor of the land.

In the Calhoun Case, the grantor of the land had merely reserved "all the mineral rights under said property and with the right to enter upon said property for the development of same." Hence it could not have been decided, nor contended with reason, that the grantor of the land had reserved the ownership of the fugitive minerals, oil and gas. The only issue that was presented in that case was stated in the opinion thus:

"Plaintiff states that there was no consideration passed from Ardis to himself for the mineral rights which the former retained under the cited clause in the act of sale."

There is therefore nothing in the opinion or decision in De Moss v. Sample or in Calhoun v. Ardis in conflict with the decisions heretofore cited, holding that the fugitive minerals, oil and gas, while at large beneath the surface of the earth, are not subject to private ownership.

Counsel for appellees argue that a contract purporting to sell or reserve the oil or gas beneath the surface of a tract of land cannot be construed as creating a real right upon the land, because, if so construed, it would create a servitude not in favor of another estate, but in favor of a person or corporation. The contention is that the Civil Code forbids the creation of any servitude upon an estate in favor of a person, excepting usufruct, use and habitation, which personal servitudes terminate at the death of the person in whose favor they have been established.

The argument is founded upon the first

paragraph of article 709 of the Civil Code, viz.:

"Owners have a right to establish on their estates, or in favor of their estates, such servitudes as they deem proper; provided, nevertheless, that the services be not imposed on the person or in favor of the person, but only on an estate or in favor of an estate."

The language quoted can hardly be construed literally, for it will not do to say that the essential element of a servitude is that the services shall be imposed either "on an estate or in favor of an estate." The obligation must be imposed on an estate, whether it be in favor of an estate or in favor of a person, for, if it be not imposed on an estate, it will not be a real obligation, and all servitudes are real obligations. What is meant by the language of article 709 of the Code is that, in order to create a servitude, the obligation must be imposed upon an estate, not upon a person; that, to create a predial servitude, the obligation must be established also in favor of an estate; and that, in either case, the obligation of the owner of the servient estate shall not be an obligation to do anything, obligatio in faciendo, but shall be merely an obligation to abstain from interference with the obligee's enjoyment of the servitude. We know, from the history of the law, and the causes and incidents that brought about the adoption of the corresponding article (686) of the French Code, that the purpose was to abolish the feudal system of binding the owner of an estate, by virtue of his ownership, to the performance of services to or in favor of another person or an estate. What is meant, therefore, by prohibiting the establishment of personal servitudes is that no obligation to perform a service shall be imposed upon a person; not that the servitude or real obligation may not be established in favor of a person as well as in favor of an estate. That is probably the significance of the word "services," in the Louisiana Code, in place of

the original word "servitudes," in the corresponding article (705) of the French text of the Code of 1825.

If the language of article 709 must be construed as having abolished all servitudes in favor of persons (excepting the lifetime usufruct, use and habitation), the abolishment was only of the name "servitude"; for there are several articles of the Code that plainly recognize the validity of servitudes in favor of persons, all of which are of the one or another of the three sorts called usufruct, use and habitation, but are not essentially life estates.

For example, article 648 declares:

"If then a stipulation be made * * * in favor of a person, and not in favor of an estate, the obligation will not be null on that account, but it will not create a real servitude."

That does not mean that a stipulation of a servitude in favor of a person will not create a genuine servitude. It means that it will not create a real or predial or landed servitude, as defined in the preceding article (646), viz.:

"Real servitudes, which are also called predial or landed servitudes, are those which the owner of an estate enjoys on a neighboring estate for the benefit of his own estate. They are called predial or landed servitudes, because, being established for the benefit of an estate, they are rather due to the estate than to the owner personally."

Surely, article 648, recognizing the validity of servitudes in favor of persons, does not refer to the lifetime usufruct or life estate, nor to use or habitation, all of which personal servitudes are treated of in another title of the Code, all to themselves; for there could not be any reason for affirming (in article 648) that the personal servitudes called usufruct, use and habitation are valid, notwithstanding they are not real servitudes. It is true article 646 declares that personal servitudes terminate with the life of the person for whose benefit they are estab-

lished, and declares that that kind of servitude is of three sorts, usufruct, use and habitation. But that does not mean that a servitude cannot be established in favor of a person without the condition that it shall terminate at his death, constitute a life estate, and be governed, not by the stipulations of the contract, but by the general rules laid down with regard to usufruct, use and habitation. As a matter of fact, all servitudes in favor of persons are "of three sorts," because every servitude in favor of a person except, use and habitation, is a sort of usufruct.

While article 606, like article 646, declares that "the right of usufruct expires at the death of the usufructuary," the next following article (607) declares that that is true only "if the contrary has not been expressly stipulated." And so article 608 declares that the right of usufruct shall begin and end at the time stipulated, if a time be stipulated, in the title.

Article 533 of the Code defines usufruct as the right to enjoy the property of another "and to draw from the same all the profit, utility and advantages which it may produce, provided it be"—as to a perfect usufruct—"without altering the substance of the thing." But article 539 declares that the right of usufruct, i. e., the right to draw from the property all of the profit, utility and advantages which it may produce, may be limited or divided, or "be conferred on several persons in divided or undivided portions." And article 542 goes so far as to say that—

A "usufruct may be established, * * * in a word, under all such modifications as the person who gives such a right may be pleased to annex to it."

Consonant therewith, article 657 says of servitude:

"Nothing prevents the advantage resulting from it from being divided, if it be susceptible of division; as, for example, the right of taking a certain number of loads of earth from the land of another, or of sending to pasture a certain number of animals on the land of another."

Why may we not add the further example "of extracting the mineral oil and gas from the land of another"? For article 2013 repeats:

"The real obligation, created by condition annexed to the alienation of real property, is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law."

A right of way for operating a railroad or tramroad upon one estate for the benefit of another is a servitude (as was said in Coguenhem v. Trosclair, 137 La. 985, 69 South. 800); and such right of way may be granted as well in favor of a person or corporation as in favor of a neighboring estate. As is said in article 648 of the Code, of course, "if then a stipulation be made * * * in favor of a person, and not in favor of an estate, the obligation will not be null on that account, but it will not create a real servitude," or predial or landed servitude.

The right of a person to draw subterranean or mineral water by means of wells on the land of another person is a real right or real obligation, and is classified as a servitude. And we can see no difference, as far as legal principles go, between the right to take mineral water and the right to take mineral oil or gas from the land of a person other than the owner of such right.

Counsel for appellees lay great stress upon article 505 of the Civil Code, viz.:

"The ownership of the soil carries with it the ownership of all that is directly above and under it.

"The owner may make upon it all the plantations, and erect all the buildings which he thinks proper, under the exceptions established in the title: Of Servitudes.

"He may construct below the soil all manner of works, digging as deep as he deems convenient, and draw from them all the benefits which may accrue, under such modifications as may

result from the laws and regulations concerning mines and the laws and regulations of the police."

But it would be choplogic to say that, as "the ownership of the soil carries with it all that is directly above and under it," therefore the ownership of the soil carries with it the ownership of things that are not otherwise susceptible of private ownership, provided they be above or under the soil. The last paragraph of article 505 indicates plainly, with regard to the fugitive minerals, oil and gas, and subterranean water, that the ownership of the soil carries with it merely the right to "construct below the soil all manner of works, digging as deep as he (the owner of the soil) deems convenient, and to draw from them all the benefits which may accrue, under such modifications as may result from the laws and regulations concerning mines," etc. In that sense alone (as was said in Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304, and repeated in Ohio Oil Co. v. Indiana, supra), it may be said that the ownership of the soil carries with it the fugitive minerals, oil and gas, and subterranean water, so long as they are directly under the surface of the soil. But, as was pointed out in Ohio Oil Co. v. Indiana, supra, ownership of the right to acquire the fugitive minerals, oil and gas, and subterranean water, must not be confused with the ownership of the fugitive oil or gas, or subterranean water, itself.

It might as well be argued that article 505 of the Code confers upon the owner of the surface of the soil ownership of the air and the clouds overhead and the rays of sunshine. The surface owner has the right to enjoy the air and sunshine above his land, to utilize the breezes to operate his windmills, and to appropriate to his own use the water that falls from the clouds. But, if he should sell the right to come upon his land and enjoy the air and sunshine, he could not add to or change the effect of the contract by pretending to sell the air or the sunshine itself.

It is contended on behalf of the appellees, particularly by the attorneys who have appeared as amici curiæ, that, if oil and gas at large beneath the surface of the earth are not subject to private ownership apart from the land, taxes assessed against lands, and based upon their having, or being supposed to have, oil or gas beneath the surface, must be declared illegal. We have already approved the method of assessment of oil-bearing lands of adding to their agricultural or surface value their mineral value in proportion to the royalties being received by the owner. See Palmer Co. v. Police Jury, 142 La. 1080, 78 South. 123. In addition thereto, the state levies an annual license tax, or conservation tax, of one-half of 1 per cent. upon the gross value (excepting the royalty interest belonging to the owner of the land) of the production of oil, gas and other minerals, upon every person, firm, association or corporation engaged in the business of severing minerals from the soil. See Act No. 209 of 1912; State v. Stiles, 137 La. 540, 68 South. 947. The Legislature has also authorized police juries to levy similar license taxes for the parishes. See Act No. 296 of 1914; Standard Oil Co. v. Police Jury, 140 La. 42, 72 South. 802. As far as we know, the state has never undertaken to assess for taxes, as property separate and apart from the land, oil or gas beneath the surface of any tract of land, or supposed to be there. The question whether the state has the right to levy such an assessment is not before us in this case.

[5] Our conclusion is that the reservation in the act of sale of their land by Ernest N. Salling and wife to E. W. and E. A. Frost created a real right, or servitude of the sort called usufruct, in favor of the grantors of the land, to enter upon the land and bore

and explore for and take away the oil and gas supposed to be under the surface of the land, and that the right that was thus reserved has been extinguished by the prescription by which servitudes are extinguished by nonuser for 10 years, according to articles 789, 3529, and 3546 of the Civil Code.

The judgments appealed from are therefore annulled; and it is now ordered, adjudged and decreed that the pleas of prescription of 10 years, filed by the plaintiff, Frost-Johnson Lumber Company, be, and the same are, sustained. It is therefore ordered, adjudged and decreed that the right and privilege reserved by Ernest N. Salling and his wife, Lottie A. Salling, to enter upon the lands they sold to E. W. Frost and E. A. Frost, by the deed filed and recorded on the 9th of July, 1903, in Book of Conveyances No. 16, p. 506 et seq., in the office of the clerk of court and ex officio recorder of the parish of De Soto, be, and the said rights are, prescribed and lost as to the heirs and legal representatives of the said Ernest N. Salling and wife, both deceased, and their transferees, the Consolidated Petroleum Corporation, of Wilmington, Del., T. J. Lawrence, of De Soto parish, La., and the Atlas Oil Company, of Chicago, Ill., in so far as said rights and privileges pertained to or affected any mineral oil or gas in or under the land so conveyed to E. W. Frost and E. A. Frost. It is further ordered adjudged and decreed that the defendants, the heirs and legal representatives of the deceased Ernest N. Salling and his deceased wife, and the Consolidated Petroleum Corporation and T. J. Lawrence and the Atlas Oil Company, shall pay the costs of these suits, respectively.

MONROE, C. J., dissents.
SOMMERVILLE, J., dissents.
PROVOSTY, J., concurs in the decree.

## On Rehearing.

### Statement of the Case.

MONROE, C. J. On July 2, 1903, Mr. and Mrs. Salling, authors in title of defendants herein, sold to E. W. and E. A. Frost, authors in title of plaintiff, some thousands of acres of land, with a certain exception and reservation. Six years later (June 16, 1909), an instrument was recorded in De Soto parish, where the lands are situated, whereby the Frosts sold them, with full warranty and no mention of any exception or reservation, to the Frost-Johnson Lumber Company, a corporation of which E. A. Frost was, and has continued to be, president, and E. W. Frost was, and has continued to be, a director; and on February 28, 1913, that company, through E. A. Frost, president, sold a small tract of the land to Green Jackson, and thereafter sold other tracts to other persons, with no exceptions or reservations or references thereto in the titles; after which, at intervals, the tracts so sold were repurchased by the company, the last repurchase having been made on March 20, 1917.

In the meanwhile the Sallings had died, and in February, 1917, their heirs and legal representatives had entered into what is called an "oil and gas lease," whereby they had "demised, let, leased," etc., all the oil and gas underlying the land in question, with the rights of ingress, egress, use, etc., that are customary in such contracts, to the Consolidated Petroleum Corporation, its successors and assigns, which corporation had assigned the lease to T. J. Lawrence, by whom it has been assigned to the Atlas Oil Company; and on June 26, 1917, that company was engaged in drilling one or two wells on the land for oil and gas, when plaintiff brought three actions in jactitation of title, alleging ownership and possession of the land and slander of title by the Sall-

ing heirs and representatives and the Consolidated Petroleum Corporation, by the parties first mentioned and T. J. Lawrence, and by said parties and the Atlas Oil Company, respectively, in claiming ownership of the underlying oil and gas and attempting to lease the same for the development of those minerals, in obtaining and causing to be recorded as valid an oil, gas, and mineral lease upon said property belonging to petitioner, and in entering upon the lands and drilling a well for oil and gas, thereby disturbing petitioner's possession.

Exceptions were filed by some of the defendants to the jurisdiction of the court, ratione personæ, and by all of them to the right of the plaintiff to bring the suits, on the ground that it was not in possession of the property the title to which was alleged to be slandered; which exceptions were referred to the merits, by consent and without prejudice.

Defendants answered, affirming the validity of the Salling title and lease and of the various acts charged against them, and plaintiff thereupon pleaded the prescription of 10 years, liberandi causa; the three suits were consolidated for the purposes of the trial; there was a hearing, which resulted in a judgment overruling the plea of prescription and rejecting plaintiff's demands; and plaintiff prosecutes this appeal.

Defendants' exception and reservation and plaintiff's plea of prescription read as follows:

Exception and reservation:

" * * * Excepting and reserving to the first parties, however, all minerals, coal, fossils and precious stones, in, upon or underneath the lands * * * described, together with all mining rights connected therewith, including the right to enter upon * * * described lands, prospect for, dig and remove any and all minerals and precious stones, * * * with the right to use so much of the said surface of the said lands as may be necessary for such purposes; also excepting and reserving unto the first parties the exclusive right and privilege to enter upon the lands, * * * or any part thereof, and more, explore for gas and oil, and to utilize and sell gas and oil that may be found or discovered upon said lands, and to use such portions of the surface of said lands as may be necessary to carry on or conduct their oil and gas operations on said lands, and to carry and convey away from said lands such gas and oil."

Plea of prescription:

" * * * That all the rights reserved by the vendors * * * were real rights in said lands, or servitudes therein; that no attempt has been made, within 10 years from the date of said deed, to exercise any of said rights and the same are now barred by the prescription of 10 years, liberandi causa, which prescription plaintiff now pleads in bar of any rights of the defendants and as perfecting the absolute and unconditional ownership of plaintiff in all of said property."

The petitions complain of action by the Salling heirs in regard to an "oil and gas lease," and of action by the other defendants in regard to an "oil, gas, and mineral" lease, but the lease itself covers only oil and gas, and it is conceded that no question as to rights concerning any other minerals is here involved, although, as may be observed, the prescription is pleaded "in bar of any right of the defendants, and as perfecting the absolute and unconditional ownership of plaintiff in all of said property."

In support of that plea, as applied to the respective claims of the litigants to rights in or to oil and gas, plaintiff's counsel argue, in their original brief, that defendants' exception and reservation is twofold, to wit:

"(a) Of 'all minerals, coal, fossils and precious stones,' etc.; (b) 'of the exclusive right and privilege to enter and bore for oil,' and 'to utilize and sell the same'; that whatever reservation was made with reference to oil or gas necessarily grows out of the second clause, separated from the first by the conjunction 'also'; * * * that it is not necessary to resort to the rule ejusdem generis in connection with the coupling of 'coal, fossils and precious stones' with 'all minerals,' in the first clause of the reservation, although, if that

clause stood by itself, the authorities are that it would be limited by such association and by the particular nature of the auxiliary rights granted to such substances, which are applicable only to the digging of solid minerals. * * *

"The reservation as to oil and gas therefore stands alone, for, purposely, it has been inserted as a distinct reservation, because, apparently, at the early date at which this instrument was executed the parties did not know whether oil or gas would be legally considered as 'minerals,' and hence made a separate and distinct reservation of the same, so as to avoid any doubt or ambiguity. To determine, therefore, what rights of the vendor remained after the deed as to oil and gas, we can look alone to the language of the reservation affecting this particular substance. That reservation, as we have seen, is entirely different from the one relating to other forms of minerals. It is 'the exclusive right and privilege to enter upon the lands below described * * * and bore, explore for gas and oil, and to utilize and sell gas and oil that may be found or discovered.'

"The terms themselves, therefore, of the reservation, or exception, demonstrate that the vendors did not attempt to reserve a corporeal property, if such were possible, but that they stipulated, and therefore reserved, only the sole and exclusive right to go upon the lands, to drill the same for oil, and to take away the oil so found and dispose of it as owners."

Neither of the exceptions filed by defendants has been urged as such in this court, but as expressive of plaintiff's position concerning its possession of the land as a condition to its right to maintain this action, and concerning the bases of the action and plea of prescription, we make the following excerpts from the same brief, to wit:

"It is apparent that, the object of the dispute being the oil and gas in the property, the plaintiff being, concededly, in possession of the land and claiming *therewith the entire title to land and minerals, defendants setting up ownership in the latter* [italics by court], the question of possession, raised by the exception, necessarily depends upon, and must await determination of, title. For, if plaintiff has full and complete ownership and possession of the surface, it possesses ad inferno, ad cœlum; if defendants can be said to own minerals, plaintiff's possession of the surface is not possession of the minerals, and consequently affords no basis for this suit. * * *

"The prescription pleaded is not that acquirendi causa, and consequently the case presents no question of adverse possession.

"The plea distinctly, and in terms, sets up a prescription as a bar to defendant's right; that is to say, a prescription liberandi causa. * * * Under the terms of the act itself, all that was attempted to be reserved was a real right. * * * It is not necessary now to discuss the effect of the reservation as to solid minerals; * * * discussion * * * at this time would be rather academic, for the petition complains only of defendant's assertion of claim to the oil and gas, and the heirs and representatives of the Sallings * * * claim, in their answer, 'to be the owners of all oils and gases lying in and under the lands described in plaintiff's petition.' The prescription of the right so asserted, plaintiff standing on the proposition that it was a real right in its property, is the basis of this suit.

"If the Sallings had stipulated a reservation of 'all the oil and gas underneath' the land, instead of, merely, 'the exclusive right and privilege to enter upon * * * and bore,' etc., the effect would have been the same."

Authorities are then cited in support of the view that oil and gas are not susceptible of ownership, and plaintiff's position is stated as follows:

"These decisions all rest upon sound reason, for, from the very nature of the substances with which we are dealing, while the owner of the land has the exclusive right, on his own land, to seek to acquire them, they do not become his property until the effort has resulted in dominion and control by actual possession."

### Opinion.

From an analysis of the pleadings and a comparison of those of the plaintiff with the printed argument of its learned counsel, it appears that they conflict in important particulars; and, confining our attention to the pleadings in the case, as we are constrained to do, we find that the issues, properly presented for decision, may be stated, and, as stated, disposed of, as follows:

1. Was the right to servitude, which plaintiff alleges was created by the exception and reservation in the sale from the Sallings to the Frosts, barred, for nonuser, by the prescription of 10 years, liberandi causa?

The article of the Civil Code which, alone, in terms, establishes a prescription against a right of servitude, reads as follows:

"Art. 789. * * * A right to servitude is extinguished by the nonusage of the same during ten years."

But there are other articles which greatly restrict the application of article 789, to wit:

"Art. 795. * * * Prescription for nonusage does not take place against natural or necessary servitudes, which originate from the situation of places."

"Art. 653. Servitudes being essentially due from one estate to another for the advantage of the latter, they remain the same so long as no change takes place in regard to the two estates, whatever change may take place in the owners."

And, as it would be impossible to conceive of a servitude more natural or more necessary, or which more certainly originates from the situation of the places than that which the surface of the lands must owe to the estate beneath, it would seem to follow that the prescription for "nonusage" has no application herein; that the plea was properly overruled; and, since counsel say, in their brief, that "the prescription is * * * the basis of this suit," it would also seem to follow that the suit is at an end; that it is now beyond controversy that the reservation relied on by defendants at least imposed upon the estate now held by plaintiff a real right of servitude as alleged by plaintiff, whereby defendants are secured in the exercise of the "exclusive," and practically imprescriptible, "right and privilege" to enter upon that estate, and make such use of it as may be necessary in boring and exploring for oil and gas, and (if found thereon, or thereunder), to appropriate, remove, sell, or to otherwise dispose of such of those minerals as they may find.

2. Was it the intention of the parties, as expressed in their contract, that the exception and reservation therein should include the right of ownership of the Sallings in the oil and gas underlying the lands, or should include only the exclusive right to enter upon the lands, and, making such use of them as might be necessary, bore and explore for those minerals, and, finding, take and dispose of them at will?

[6] In the consideration of that question, we are to bear in mind that the contract to be interpreted was entered into in Louisiana, to be wholly executed here; that it concerns only questions of ownership and other rights in immovable property here situated; and that, the conformity to the Constitution of the United States of the law of Louisiana governing those questions being wholly undisputed, they are to be decided in accordance with that law, and no other, 32 Cyc. 674, citing, among other cases: U. S. v. Fox, 94 U. S. 315, 24 L. Ed. 192; Brine v. Hartford Ins. Co., 96 U. S. 627, 24 L. Ed. 858; Hutchinson Invest. Co. v. Caldwell, 152 U. S. 65, 14 Sup. Ct. 504, 38 L. Ed. 356; De Vaughn v. Hutchinson, 155 U. S. 566, 17 Sup. Ct. 461, 41 L. Ed. 827; L. R. A. Dig. U. S. Sup. Ct. vol. 1, p. 343; Id. p. 399; vol. 2, p. 1550 et seq.; Hughes v. Hughes, 14 La. Ann. 85.

The law of Louisiana (C. C. arts. 1950, 1955, 1903), declares that—

"When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms. All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act. The obligation of contracts extends, not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect."

In the instant case, as we have seen, the contract evidences the sale of described lands, less certain of the constituent elements of ownership, which the sellers and buyers agreed, and so declared in the act, should be excepted and reserved from the

sale, to wit (eliminating words irrelevant to present inquiry):

"All minerals, coal, fossils and precious stones * * * underneath the lands, * * * including the right to enter, * * * prospect for, dig and remove all minerals and precious stones, * * * with the use of so much of the surface of said lands as may be necessary for such purposes; also excepting and reserving * * * the exclusive right and privilege to enter upon the lands * * * and bore, explore for oil and gas, and to utilize and sell oil and gas that may be found, and to use such portions of the surface of said lands as may be necessary to carry on * * * their oil and gas operations, * * * and to carry away * * * such gas and oil."

We infer from the record that the Sallings, who owned the lands, lived in a distant state, and had probably acquired them as an investment and with reference, more particularly, to the timber that was standing on them, and that the Frosts, who appear to have been heavily interested in the lumber business, bought them for the timber. There is, however, no evidence to show whether the minerals were withheld from the sale because the Sallings did not care, at that time, to sell them, or because the Frosts did not care to buy them. It is hardly conceivable that they should have agreed that all minerals should have been excepted from the sale if they had intended that less than all of them should be so excepted, since the Frosts, as we infer, paid nothing for minerals and the Sallings received nothing; and they cannot be presumed to have intended to give any of them to the Frosts. It is conceivable that certain minerals should have been specified as included in those excepted from the sale, since the attention of the sellers may have been particularly attracted to them, or they may have regarded them as unusual, and the specification may, in their opinion, have made their exception more certain than to leave them included in the general term "all minerals." That natural oil and gas are re-

garded as minerals, and hence that they were included in the affirmative and positive terms of the exception from the sale of "all minerals," cannot be denied; and, as against the presumption that what was thus done was intended to be done, there is nothing but the unauthorized inference that, though the parties declared that all minerals were excepted, they intended to except only those which were specified, or those of like character. If, however, that doctrine were accepted, the Frosts, or their assigns, might find themselves, to their great surprise, the owners of salt or sulphur mines (they being extensively mined in this state), for which they paid nothing, and never expected to acquire, or even gold mines, notwithstanding that about the only resemblance between that mineral and coal, fossils, and precious stones is that they are all what are called solids, though they may differ in their solidity, and though gold is not at all ejusdem generis as coal and fossils as to value, nor of like character as precious stones as to composition. Again, only a few years (perhaps two or three) prior to 1903, when the contract in question was entered into, oil, and possibly gas, had been developed at "Spindle Top," near Beaumont, Tex., not more than a night's ride by train from De Soto parish, and, as surface indications of oil had for many years, been observed in different parts of Louisiana, oil was more considered and talked about at the date of the contract than all other minerals combined. In fact, litigation about oil lands and oil leases reached this court as early as 1904, and probably earlier (Jennings-Heywood Oil Syndicate v. Home Oil Co., 113 La. 383, 37 South. 1), and has continuously swelled the volume of its business since that time. Beyond that, why, if it was not intended to include oil and gas in the exception of "all minerals" from the sale, should it have been

agreed that the sellers of the lands should have the "exclusive right and privilege" at their pleasure and indefinitely to enter thereon, bore, and explore them for oil and gas, take all of those substances that are to be found, and appropriate them to their own use? What object could any sane men have had in thus dealing with all the essential constituents of ownership and denying ownership itself?

[7, 8] Apart, however, from the surrounding or concurring circumstances, our reconsideration of the matter satisfies us that the exception and reservation of the exclusive right to enter, bore for, and take the oil and gas is as intimately and grammatically connected with the antecedent exception and reservation of the ownership of all minerals as is the right to enter, dig for, and take the solid minerals; the plain intention, as we conclude, having been to make a general exception and reservation covering the ownership of "all minerals," then an exception and reservation of the right to dig, as appropriate to the mining of solids, followed by a reservation of the right to bore, as appropriate to the mining of oil and gas; and that intention, we think, has been carried into effect by the language used. With reference to other positions taken by plaintiff's counsel in the argument of the case, our findings and conclusions are as follows:

Plaintiff alleges in its petition that it is the owner of the lands which it describes, and that allegation carries with it a claim to the ownership of everything that may lie under the surface of the lands, since the law (C. C. art. 505) reads:

"Ownership of the soil carries with it * * * all that is directly above and under it."

But, more definitely still, it alleges, in its plea of prescription, not that the underlying oil and gas are insusceptible of ownership while under the soil, nor yet that they may not, in that situation, be effectively and legally excepted and withheld from a sale of the lands, but that the contract under which such ownership is here claimed by the litigants on both sides fails to except and reserve the ownership, and, by its terms, excepts and reserves only the exclusive right to enter upon the lands and there take the oil and gas that is to be found, appropriate, remove, and sell or otherwise dispose of them. And, as against that right, alleged to create a servitude upon the lands, as acquired by its authors in title, plaintiff pleads the prescription liberandi causa. According to its terms, that plea would appear to be directed against all claims set up by defendants, including that of ownership in, and rights to enter, dig for, and appropriate, the solid minerals, as well as those rights ("bore" being substituted for "dig") with respect to oil and gas; but it is conceded that there is here no controversy about the solid minerals, and the pleaded contention is that, if the prescription be maintained as to defendant's ownership of the oil and gas, such ruling will operate to perfect the absolute and unconditional ownership of plaintiff in all of the property. Thus plaintiff alleges that it pleads the prescription in question "in bar of any right of the defendants, and as perfecting the absolute and unconditional ownership of plaintiff in all of said property"; to which judicial allegations its counsel add the statements hereinbefore quoted from their brief, to wit:

"It is apparent that, the object of the dispute being the oil and gas in the property, the plaintiff being concededly in possession of the land, and claiming therewith the entire title to land and minerals, defendants setting up ownership in the latter, the question of possession raised by the exception necessarily depends upon, and must await, determination of title."

[9, 10] The pleadings in the case, therefore, present no issue upon the question of the susceptibility vel non of oil and gas to owner-

ship, but, to the contrary,. concede the susceptibility, invoke the action of the court upon the question whether the ownership is vested in plaintiff or defendants, and leave no room for either argument or action upon the question of susceptibility vel non; though plaintiff's counsel, after pleading "absolute and unconditional ownership" in plaintiff, argue first in support of that plea, and then in the alternative, and, in the event that the court should be inclined to hold that the ownership of the oil and gas having been vested in the Sallings as to oil and gas lying directly under the land held by them, and having been excepted and reserved from the sale of the land, remained so vested, then argue that oil and gas in situ are not susceptible of ownership; which question has been so exhaustively argued, not only by the counsel representing the litigants before the court, but by numerous amici curiæ, having clients who are interested therein, that, as to that doctrine, the court will probably never be in a better position to decide it. Courts are not, however, at liberty to decide cases upon issues which are raised in arguments only, and are in conflict with those raised by the pleadings. The pleadings, it is true, may be enlarged by the admission of evidence to which no objection is made, but in this case there is no evidence which tends to enlarge the pleadings and the fact upon which the doctrine in question is based, to wit: That those minerals beneath the surface are comparatively unconfined, and capable or susceptible of almost unlimited movement has been neither proved nor attempted to be proved.

Being of opinion, then, that the decision of this case is to be governed exclusively by the law of Louisiana; that the question whether natural oil and gas in situ are susceptible of ownership has not been put at issue by the pleadings herein, but that, to the contrary, it is judicially alleged by the litigants on both sides, and the action of the court is invoked upon the theory that those minerals, so situated, are susceptible of ownership—it would be a work of supererogation, and beyond the proper scope of this opinion, for us to express our views concerning the decisions to which we have been referred of the courts of other jurisdictions interpreting other laws, and determining questions of the legality of action thereunder, as affected by the restrictions imposed by the Constitution of the United States. As their concluding argument, plaintiff's able and indefatigable counsel say that, if it be held that the exception and reservation by the Sallings of the exclusive right to enter upon the lands and bore, explore, take, and dispose of the oil and gas to be found thereunder is not entirely disconnected from the exception and reservation of " all minerals," etc., which preceded, it must be regarded merely as a mobilization by anticipation of the oil and gas, and not as the creation of a separate estate; or, in the language of the brief, that it "is not a sale of ownership in the land, not a separation of the area from the trefond, but a sale of the minerals, mobilized by anticipation," which, while it creates a real right, does not create a separate estate. And, in support of that view, attention is called to decisions by this court to the effect that growing crops and standing trees may be so mobilized. In Bank v. Wiltz, 31 La. Ann. 244, first cited, it was held that the privilege and pledge of the factor or furnisher of supplies on the growing sugar cane crop, under the act of 1874, covered that portion of the crop which, in the ordinary sense, was to become merchantable, and took precedence of an antecedent mortgage, but that it did not cover that portion that was reasonably reserved for seed. The mobilization of the merchantable crop, for a special purpose, resulted, therefore, from a special statute; otherwise it would

have remained an immovable, as provided by C. C. art. 465. In Williams v. Triche, 107 La. 32, 31 South. 926, it was held that where the right to cut and remove standing trees was sold by the owner of the land, though the trees were not to become the property of the purchaser until cut and removed, they continued to form part of the land, and were properly assessed to its owner.

And, by Act 188 of 1904, p. 420, it was declared that standing timber shall remain an immovable, and subject to all the laws applicable to immovables, though separated in ownership from the soil; provided that the act shall not be construed as affecting existing laws relative to the assessment and taxation of such timber. It is clear, therefore, that standing crops are mobilized as the result of a pledge, only by reason of special legislation, and that otherwise they continue to be part of the immovable upon which they stand until severed therefrom, and that the same is true of standing trees, save in the matter of assessment and taxation. Counsel also cite French authorities to the effect that stone from quarries and standing timber may be sold as movable property, and in such cases treated as such. But, in this case the owner of the land, of which all the underlying minerals formed part, sold it, excepting and reserving that part, to wit, all the minerals, the whole transaction being one concerning a title to immovable property, dealt with as such, and the dismemberment thereof; to which view, and to the view that a separate estate was thereby created, plaintiff is irrevocably committed by its allegation that the exception and reservation of the minerals and of the mining rights with respect to them established a real right or servitude on the interest conveyed to its author in title since the law (C. C. art. 648) upon that subject reads:

"To establish a predial, or real, servitude, there must, first, be two different estates, one of which owes the servitude to the other."

M. Demolombe says,

"Without doubt, the owner of the soil can alienate a part of the land, an underground or a surface part of it; he can alienate, for instance, the mine itself. * * * In these different cases, there is no doubt that it is necessary to consider as immovable the rights of the acquirer, who, in effect, himself becomes an owner of part of the immovable, considered in its state of immovable, and to be possessed and exploited as immovable." 9 Demolombe, De La Distinction Des Biens, p. 84, No. 162.

In the common-law states, it seems to be well settled that:

"The severance of a mine and the surface of lands may be accomplished by a conveyance of the mines and minerals, or by a conveyance of the land with a reservation or exception as to mines and minerals. There is no substantial difference between the two methods, in the result accomplished; for a reservation will be construed as an exception where that is the plain intent, and the grantor will retain in himself a fee-simple estate in the portion reserved. * * * Either a grant or exception of 'minerals' will include all inorganic substances which can be taken from the land, and to restrict the meaning of the term there must be qualifying words or language evincing that the parties contemplated something less general than all substances legally cognizable as minerals.

"Contracts excepting ores and minerals from grants of land, with a reservation of the right to enter upon the portion thereof granted, are in accordance with long established usage and have been invariably held by the courts to be valid; hence they are not contrary to public policy. It must be remembered, however, that the owner may convey the minerals upon condition that the vendee extract them by a specific time, or in a stipulated mode, or that title shall pass only when certain royalties are paid; in these instances there is no present, consummated, sale." 18 R. C. L. p. 1175, § 84. See, also, p. 1178, § 86.

For the reasons thus assigned, we are of opinion that the judgment appealed from should be affirmed; and it is so ordered.

The right of the plaintiff to apply for a rehearing is reserved.

PROVOSTY, J., concurs in the result and hands down concurring opinion.

O'NIELL, J., dissents and hands down reasons.

DAWKINS, J., dissents.

PROVOSTY, J. I concur in the result of the decision handed down in these suits by the Chief Justice, and will give my reasons for so doing.

The only facts now pertinent are as follows:

In 1903 the Salling heirs, defendants in these suits, sold a tract of land to E. W. and E. A. Frost, with a reservation in the act of sale in these words:

"Excepting and reserving unto the first parties however, all minerals, coal, fossils and precious stones in, upon or underneath the lands below described, together with all mining rights connected therewith, including the right to enter upon the below-described lands, prospect for, dig and remove any and all minerals and precious stones in, upon or contained in said lands, with the right to use so much of said surface of said lands as may be necessary for such purposes, also excepting and reserving unto the first parties the exclusive right and privilege to enter upon the lands below described or any part thereof, and bore, explore for gas and oil and to utilize and sell gas and oil that may be found or discovered in said lands, and to use such portions of the surface of said lands as may be necessary to carry on or conduct their oil and gas operations on said land, and to carry away from said lands such gas and oil."

In 1909, no oil or gas having yet been discovered on the land or in its neighborhood, the Frosts sold the land to the Frost-Johnson Lumber Company, plaintiff in these suits, with no reservation of any kind, and no mention of the reservation which the Salling heirs had made.

In 1917, the Salling heirs made oil and gas leases upon the land in favor of the several companies, codefendants in these suits, and the leases were recorded; and thereupon the plaintiff company brought these suits, claiming that by the said leases its title to the land was being slandered, because the reservation of oil and gas which the Salling heirs had made was merely of a servitude which had terminated by prescription, it not having been exercised within the ten years following the date of the reservation.

One reason assigned by plaintiff why the said reservation of oil and gas was merely of a servitude is that oil and gas while still underground, or in situ, are not susceptible of private ownership. And it is this question which must first be discussed.

In support of the affirmative, the plaintiff cites the decision of the Supreme Court of the United States in Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729, and the decisions of this court in Wadkins v. Atlanta & Shreveport Oil & Gas Co., not reported, and Hanby v. Texas Co., 140 La. 189, 72 South. 933, and refers to the following decisions as having cited with approval the three decisions here mentioned, and as containing expressions or dicta in line with their doctrine, to wit: Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623; Cooke v. Same, 135 La. 616, 65 South. 758; Elder v. Ellerby, 135 La. 995, 66 South. 337; Strother v. Mangham, 138 La. 437, 70 South. 426; Saunders v. Busch-Everett Co., 138 La. 1049, 71 South. 153; and Higgins Oil Co. v. Guaranty Oil Co., 145 La. 233, 82 South. 206, 5 A. L. R. 411.

In support of the negative the defendants cite De Moss v. Sample, 143 La. 243, 78 South. 482, and Calhoun v. Ardis, 144 La. 311, 80 South. 548; and also a decision of the Court of Appeal, Second circuit, in the case of Bradford v. Williams, wherein a writ of certiorari was refused by this court, and, as containing favorable dicta, the cases of Rives and Cooke, supra.

I will not go over that jurisprudence; both sides are claiming that the preponderance of it is in their favor, which shows

that the question is still an open one in this state.

Those of said decisions and dicta which are on the affirmative side may be said to have followed docilely the decision in Ohio Oil Co. v. Indiana, which in turn may be said to have been induced by the then prevalent notion that oil and gas lie in reservoirs underground, and have no fixed situs, but circulate freely there, whereas the geologic fact may be said to be now reliably ascertained that these minerals are contained in shale and sand strata, which they permeate, and that the lateral movement of the oil is sluggish, and more often than not restricted within narrow bounds, as is witnessed by the proximity of the wells to each other in a developed oil field—presenting the appearance of a forest of derricks—and by the expert testimony before this court in other cases to the effect that, as a rule, offsetting wells for protection against wells upon adjoining land are not deemed necessary as against wells no nearer to the boundary line than 200 feet; in other words, that the draining influence of a well is supposed not to extend farther than this.

In an article which appeared in the Michigan Law Review of April, 1920, by Mr. James A. Veasey, who evidently has given much study and thought to this subject, the following is found:

"We again advert to the fact that oil and gas in their natural state do not migrate laterally, but, to the contrary, maintain their original situs. The only circumstance which induces their perceptible movement is a well penetrating the producing strata, and even then drainage is not an inevitable result. Whether there is any drainage by adjacent wells in a particular case, and the extent of that drainage, are pure questions of fact, to be determined by the capacity of the adjoining wells, the porosity of the sand, regularity of the producing formation, the degree of rock pressure, and such other circumstances as would control the judgment of a practical operator in reaching a conclusion respecting the matter of drainage."

The cases cited in Ohio Oil Co. v. Indiana from the Supreme Court of Pennsylvania do not hold that the owner of the soil is not owner of the oil and gas under the surface and forming part of the land. Thus, in Hague v. Wheeler, 157 Pa. 324, 27 Atl. 714, 22 L. R. A. 141, 37 Am. St. Rep. 736, the court said:

"But the owner of the surface is an owner downward to the center, until the underlying strata have been severed * * * by sale. What is found within the boundaries of his tract belongs to him according to its nature. The air and the water he may use. The coal and iron or other solid mineral he may mine and carry away. The oil and gas he may bring to the surface and sell in like manner to be carried away and consumed. His dominion is, upon general principles, as absolute over the fluid, as the solid minerals. It is exercised in the same manner, and with the same results. He cannot estimate the quantity in place of gas or oil as he might of the solid minerals. He cannot prevent its movement away from him, towards an outlet on some other person's land, which may be more or less rapid, depending on the dip of the rock or the coarseness of the sand composing it; but so long as he can reach it and bring it to the surface, it is his absolutely, to sell, to use, to give away, or to squander, as in the case of his other property. In the disposition he may make of it he is subject to two limitations. He must not disregard his obligations to the public. He must not disregard his neighbor's rights."

See, also, Barnard v. Monongahela Gas Co., 216 Pa. 362, 65 Atl. 801.

And the later decisions of the Supreme Court of Indiana are practically to the same effect. Thus, in Kahle v. Crown Oil Co., 180 Ind. 131, 100 N. E. 681 (1913) the court said:

"Petroleum in and under the surface of the earth, and not reduced to actual possession of any person, constitutes a part of the land, and belongs to the owner thereof, who has the right to reduce the mineral to possession or grant the privilege of doing so to other persons."

And in Fairbanks v. Warrum, 56 Ind. App. 337, 104 N. E. 983:

"We proceed to determine whether or not said paragraph of complaint states a cause of

action. Noble Warrum at the time of the execution of said lease was, as the owner of the fee, the owner of everything that went to make up the realty. The natural gas beneath the surface was a part of thé realty, and therefore Noble Warrum was the owner of such gas. By reason of the fugitive character of natural gas, however, he was such owner only in a qualified sense. As long as such substance remained beneath the surface of his land, he continued to be such owner, until in some manner he parted with the title thereto. But if, by its natural tendency to flow, it should escape to the lands of an adjoining proprietor, such ownership would thereby cease."

For an authoritative statement of the view taken by the courts of this country generally of the susceptibility of oil and gas in place to ownership, I may quote from the decision in Kansas Natural Gas Co. v. Haskell (C. C.) 172 Fed. 545, as follows:

"The rule of property right in natural gas and oil in all the states save Indiana is stated by Mr. Justice Shiras in Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304, as follows:
" 'Petroleum gas and oil belong to the owners of the land, and are a part of it, so long as they are on it or in it, or subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills in his own land and taps a deposit of oil or gas extending under his neighbor's field, so that it comes into his well, it becomes his property.' "

However authoritative, therefore, may be the decisions of the Supreme Court of the United States, and however profound may be the respect due to the views of the great jurist who was the organ of the court in this Ohio Oil Company Case, I think that that decision must be held to be founded upon an exploded supposed geologic fact, and to be counter to the view generally entertained by the courts of this country.

Basing themselves upon it, the learned counsel in this case say that—

"It is legally impossible for the oil as yet contained within its containing stratum to be in the ownership of any one."

150 LA.—26

How this can be reconciled with the fact that the land does not consist of the surface alone, but of the entirety—the under part, comprising all that composes it, as well as the surface—I am at a loss to imagine, especially in this state, where that fact, or truism, is matter of statutory law; article 505, C. C., reading:

"The ownership of the soil carries with it the ownership of all that is directly above and under it."

The oil and gas are under, and therefore the ownership of the surface carries the ownership of them.

Whatever justification the courts of the other states might have for adopting a conclusion opposed to the truism that oil and gas, being part of the soil, belong to the owner of the soil (on the principle that the parts composing a whole belong to the owner of the whole), certain it is that the courts of this state are utterly without authority to adopt any such conclusion. For in this state that truism has been enacted into statutory law, and statutory law is binding on the courts. The right of the Legislature so to prescribe is undoubted. No one will contest the proposition that the power resides in the constituted authorities of every free nation to prescribe what things shall be, or shall not be, property, and in what way or ways property may be acquired. Nor will any one contest the proposition that, within the rule of due process of law, this same power belongs in the same measure to the several states of this Union, and is vested in their Legislatures, nor the proposition that the said article 505 does not deprive any one of property without due process of law, or that it is not for any other reason unconstitutional. The said statutory provision does not except oil and gas from the ownership which it establishes, and the courts are powerless to insert the exception.

Susceptibility to ownership is denied because these minerals possess the power of

self-transmission, and may escape. But because a thing possesses the power of self-transmission, and may escape, is not a reason why it should be insusceptible of ownership.

Our horses and mules and sheep and cattle, our chickens and ducks and geese, possess this power of self-transmission in a greater degree than oil; they are not for that reason insusceptible of ownership.

And, if it is said that these things are not analogous to oil, because they may be confined, or controlled, whereas gas and oil underground may not, then, I ask, what about our pigeons and bees and fish, as to which article 519, C. C., says:

"Art. 519. Pigeons, bees or fish, which go from one pigeon house, hive or fishpond, into another pigeon house, hive or fishpond, belong to the owner of those things; provided, such pigeons, bees or fish have not been attracted thither by fraud or artifice."

Will it seriously be said that the system of laws which recognizes ownership in things so light of wing as birds and bees, and so fleet of movement as fish, and of so trifling value, denies ownership to a substance so infinitely less mobile as oil, and so valuable that its possession is now threatening to become the apple of discord between the nations of the earth? And, be it noted, all the pigeons in a pigeon house and all the bees in a hive and all the fish in a pond may escape, leaving none behind, whereas no one has ever contended that all the oil and gas in a tract of land could drain into another tract; and these living things are as insusceptible of identification after having thus escaped as oil and gas.

The fact is that the real reason why the susceptibility of underground oil and gas to ownership is denied is not because they may escape, but because they are supposed to be incapable of being reduced to actual possession so that they may be prevented from escaping. The latter supposition is incorrect, since one tract may be protected against the wells of another tract by means of off-setting wells. But, if we grant the impossibility of reducing the oil and gas to actual possession, while still underground, does it follow that they are for that reason insusceptible of ownership. Article 496, C. C., provides expressly to the contrary. It reads:

"Art. 496. The ownership and the possession of a thing are entirely distinct.

"The right of ownership exists independently of the exercise of it. The owner is not less the owner because he performs no act of ownership, or because he is disabled from performing any such acts, or even because another performs such acts without the knowledge or against the will of the owner."

That a thing may escape shows that the ownership of it may be lost, not that the thing is insusceptible of ownership.

The ownership of oil and gas underground may be more or less precarious, and is undoubtedly so for the part which may escape; but what ownership is there that is not more or less precarious in many respects—for instance, in being held subject to the police power, to the eminent domain power, and to the taxation power; subject also to the maxim, "Sic utere tuo ut alienum non lædas;" and subject to being lost through the prescription of 10 and 30 years, and through accession, as the result of the thing which forms the subject of it being insusceptible to identification after it has passed into the possession of some one else. The ownership of oil and gas is, no doubt, subject to the qualification that it is lost if the oil and gas migrate from the land; but that is no reason why these minerals should not belong to the owner of the land while they remain in the land. The reason why they are no longer the property of the person from whose land they have migrated is that they have become the property of the person to whose land they have migrated. They belong to this new owner because they form part of his land.

The reason why the ownership of them is

lost is that they can no longer be identified, and because no one can know that they ever migrated from another land, and were not originally formed in the land from which they come. If the oils of different tracts were so characterized by color, density, or other quality that they could be traced and identified wherever they went, the law might easily allow them to be revendicated wherever found, precisely as a stray horse or mule is allowed to be revendicated; but, in the absence of any means of identification, the law in its impotence finds itself compelled to abide by the rule according to which the oil is conclusively presumed to have always formed part of the land out of which it comes.

*Ohio Oil Co. v. Indiana* recognizes in the owner of the surface the exclusive right to take the oil, but does not explain whence is derived this right, or, in other words, upon what it is founded. An obvious foundation can be found for it in this surface proprietor's ownership of everything that is under his land; but, such ownership not being admitted, the question recurs, Upon what is this right of exclusion founded? To that question there can be but one answer: The surface owner has the exclusive right to take the underground oil because this oil cannot be taken except through the surface or through the perpendicular sides of his land, and, as owner of the land, he may exclude all persons from the land. This is the only possible answer; but this answer carries with it an admission of the oil itself being owned, since the oil forms part of the thing as to which the right of exclusion exists—namely, the land. The ownership merely of the surface, separate from the underneath, would not include the right to take anything underneath. A thing or a right cannot extend beyond itself. The right to take the underneath, or the things contained in it, can be derived only from the ownership of the underneath; and the ownership of the underneath means the ownership of the underground oil and gas which are as much a component part of the underneath as any other of its component parts.

If the ownership does not exist in the owner of the land it exists in nobody; and that is what learned counsel say. But let us put the proposition to the test of practical application. If the oil and gas belong to no one, they may, like a wild animal, be appropriated by any one, and be disposed of by the Legislature at will. Article 3415 of the Code says:

"It is agreeable to natural reason that those things which have no owner, shall become the property of the first occupant.

"And it is not material whether they are taken by a man upon his own ground or upon the ground of another."

Now, no one would seriously contend that the oil coming out of my land does not belong to me if brought out by some trespasser. Yet that is the conclusion which this doctrine of the nonownership of the oil by the owner of the land while still underground would inevitably lead to.

If it is said that the oil and gas thus brought to the surface of my land by a trespasser would belong to me because they would be the fruits of the exercise of my surface right to take them, I ask, whence is derived the right thus attributed to me as surface owner? As already explained, it cannot be derived from my ownership of the surface, because a thing cannot extend beyond itself; and hence the surface ownership cannot include anything beyond the surface. This right thus attributed to the surface owner belongs to him, therefore, not because he is owner of the surface, but because, as owner of the surface, he is owner of everything below the surface.

For escaping from the conclusion thus resulting, both from the nature of things and from the express terms of a statute, the proponents of this nonownership theory ar-

gue that, since oil and gas cannot be prevented from escaping from one tract of land into another, they cannot be said to "belong to some one in particular to the exclusion of all other persons," and therefore cannot come within the definition of ownership as contained in articles 488 and 494 of the Code, reading:

"Art. 488. Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons."

"Art. 494. It is the essence of the right of ownership that it cannot exist in two persons for the whole of the same thing; but they may be the owners of the same thing in common, and each for the part which he may have therein."

The argument is that, since ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons, and since "it cannot exist in two persons for the whole of the same thing," therefore oil and gas are insusceptible of ownership, because they may of their own motion pass from the land of one owner into that of another owner.

No proof whatever has been administered in this case of this supposed power of self-transmission; and if, as already stated, the resort is to be had to judicial knowledge of scientific facts, the knowledge would have to be just the other way, except as to a part of the oil and gas.

But, if it were to be granted, for the argument, that oil and gas in place cannot come within the definition of ownership as contained in the Code, would the consequence necessarily have to be that oil and gas in place cannot be the subjects of ownership? I imagine not. A thing so valuable as oil and gas in place, constituting so universally, the world over, the subjects of contract, cannot, in the nature of things, not be subjects of ownership; and hence, if the definition of ownership contained in the Code did not fit these valuable things, the consequence would have to be that the said definition would

have to be held to be antiquated, out of date, and defective, and not that underground oil and gas are not subjects of private ownership.

But nothing in said definition prevents it from fitting oil and gas in place as subjects of ownership. These things do belong to the owner of the land to the exclusion of all other persons, since he has the right to exclude all other persons from taking them. He has that right, though the exercise of it, under the circumstances, be difficult. But the exercise of the right of ownership by actual possession must not be confounded with the existence of the right. Our Code makes that very clear:

"Art. 496. The ownership and the possession of a thing are entirely distinct.

"The right of ownership exists independently of the exercise of it. The owner is not less the owner because he performs no act of ownership, or because he is disabled from performing any such acts, or even because another performs such acts without the knowledge or against the will of the owner."

When thousands of cattle ranged and multiplied on the limitless plains of the West, their owners had the greatest difficulty in rounding them up, and were liable to lose many a head through straying, and mingling with other herds. Because of this difficulty of control and liability to loss the cattle did not become insusceptible of ownership.

So far as concerns the provision of article 494, that ownership "cannot exist in two persons for the whole of the same thing," it means simply, of course, that it cannot so exist at the same time. Nothing prevents it from existing in the owner of the land so long as the oil and gas are in his land.

One single owner may own the entire oil field, so that the oil and gas could not possibly escape from his land. In such a case, if he does not own the oil and gas underneath, what becomes of article 505 of our Code, which article, as already stated, is but the enunciation of a truism. It will not be said

that the ownership of an entire oil field by one man is impossible, since, as I remember, the celebrated Spindle Top field occupies less than a section of land, and the tract of land involved in the present case contains many sections. Besides, what difference could it make that the field was owned in severalty by many owners. Would not the only effect of this be to make the underground oil and gas belong to several owners instead of to only one? We are not concerned with the rights of these owners inter se, nor with the right of the state to regulate the use and waste of the natural resources of the state, but simply with the question of ownership vel non of the oil and gas in place by the owner of the soil part of which they are.

What distance into a tract of land the influence of the wells of an adjoining tract will extend must depend, of course, upon circumstances. As a rule, it is not supposed to extend, as already stated, beyond 200 feet. So that only the edges of the tract of land can be affected. Now, while the banks of the Mississippi river are not endowed with locomotion, they are unstable, and may at any time pass from one riparian owner to another as the result of the uncontrollable action of that river; the sand and gravel in the bottoms of our rivers are shifting all the time, and a sand bed on the side of a hill on one tract of land may be washed down at any time by the rains to another tract; the sand hills on one tract may be blown by the winds to another tract. If the liability of these things to be lost to their owner does not render them, or the land from which they are lost insusceptible of ownership, why should the liability of the oil and gas on the edges of a tract of land to be lost to the owner render these things, or the mass out of which they are lost, insusceptible of ownership.

If it is said that the movement of these things results from the action of nature, not of man, whereas the migration of oil and gas from one tract of land into another is brought about by the act of the owner of the adjoining tract in sinking oil wells, or operating pumps, then, I ask, what if science should discover a means of liquifying solid minerals, so that they might move underground like oil and gas, and be drawn out of one tract by the operations on an adjoining tract. Would not the owner of these solid minerals lose his ownership of them precisely as the owner of gas and oil is said to do? But, it may be said, this is supposing something impossible. No; not so. Already rock salt is mined in that way in Kansas, and sulphur in Louisiana. Suppose a railroad right of way 50 feet wide, of which the fee itself was vested in the railroad, traversed the sulphur deposit in Louisiana, and the railroad company moved its line to another location and set to work exploiting the sulphur deposit underneath the 50-foot strip by this process of liquifying the sulphur, so that the company would be drawing the liquid sulphur from the adjoining land on both sides of the 50-foot strip. Would the solid sulphur underground become insusceptible of ownership? And yet in such a case it would be the act of man that caused the sulphur to migrate from one tract into another, precisely as in the case of oil and gas.

For all that is known, the oil and gas within the land involved in this case may be as securely confined therein as in an aboveground tank. And, at all events, they have remained fixed in place since before the formation of the delta of the Mississippi Valley, and, if not disturbed by act of God or man, would so remain fixed in place until all the lands of this delta should have shifted back and forth time and time again from one riparian owner to another as the result of that mighty river's constant erosion of its banks; they would so remain fixed in place until countless generations of men had come upon the surface of this earth and passed away; and yet it is seriously contended that

they are too mobile, fugitive, and fugacious, to be the subjects of ownership, and are sought to be likened, for the purposes of the decision of so important a case as this, to some restless wild animal.

The contention is not made that all the oil and gas may escape from a tract of land. The argument reduces itself therefrom to this: That because some part of the oil and gas may escape there can be no ownership of the part that remains—and this although no one can know with any certainty that any has escaped, or may escape, from any particular tract, that knowledge being deep underground.

The present case has to be disposed of on the assumption that at the time the reservation in question was made there was oil and gas underground, precisely in the same way that there are solid minerals in a case where a reservation is made of solid minerals. Of course, if a reservation is made of the oil and gas under the ground, and there happens to be none, the reservation will go for naught. And, if a sale is made of the oil and gas underground, the sale will have to be held to be conditional upon there being oil and gas. We are not concerned with those questions in this case. But it is instructive and illuminating to consider that, under our Code, no question can arise on the point that a sale of the hope of eventually finding and getting oil and gas out of the ground may constitute the subject of a sale. The Code is express on that point:

"Art. 2451. It also happens sometimes that an uncertain hope is sold; as a fisher sells a haul of his net before he throws it; and, although he should catch nothing, the sale still exists, because it was the hope that was sold, together with the right to have what might be caught."

Parties not knowing whether oil and gas will ever be found under the land may validly sell the hope of their being found, "together with the right to have" them should any ever be found. Why, it may be asked, may they not sell the oil and gas which they know is underground? And, if they may sell them, why may they not reserve them from a sale of the rest of the land?

I conclude that oil and gas underground are subjects of ownership, and may be sold like other things, and may be reserved from a sale of land; and I pass to the question of whether the reservation made by the Salling heirs in the act of sale to the Frosts was of the oil and gas themselves, or merely of a right to explore and take.

However, before proceeding further, I think I ought to say a word in explanation of my attitude on the first hearing of this case. I was then under the firm impression that this court was thoroughly committed to the doctrine of nonownership of oil and gas in place, so that there was nothing to do, under our jurisprudence, but to accept the conclusion that the sale or reservation of these minerals could only carry a servitude. Why I did not then test the correctness of that impression by a reference to the decisions is a matter which I am free to confess I am at a loss at present to account for, except that the said impression was so strong that, after I had read the report made by Mr. Justice O'NIELL, confirming it, I must have thought that to review the past decisions would be to employ uselessly time much needed on other points and in other cases. I had originally dissented from that doctrine (in the cases of Wadkins v. Atlanta & Shreveport Oil Co., Rives v. Gulf Refining Co., and Cooke v. same, supra), and had not individually become reconciled to it, though I had yielded my individual convictions upon it in Hanby v. Texas Co., supra. In the present concurring opinion I am therefore but expressing views which individually I have entertained all along.

Having shown hereinabove, as I believe, that the reservation may have been of the

ownership, I now pass to the question of whether or not it was in fact such.

Apparently it was not, but only of the right to explore and take; for the language of the act of sale with reference to the solid minerals is that they are reserved, whereas, with reference to the oil and gas, it is that "the exclusive right to enter upon the land and bore," etc., is reserved. But, inasmuch as the reservation, if it had been only of the right to explore and take, would have been a mere servitude, terminable in 10 years by prescription for nonuse, and, in fact, a mere usufruct, terminable with the life of the Sallings, and the parties could not possibly have intended any such thing as this, the conclusion must be that what was reserved was the ownership.

If the right thus reserved was not an ownership, it was a servitude. To that extent I agree with plaintiff's learned counsel, because, for classifying the right thus reserved, the choice lies between ownership and servitude. There is no other alternative. It will not do to say, in a vague and general sort of way, that this right was a real right, and stop there; for a real right such as this, if not an ownership, is a servitude, and can be nothing else.

Articles 647 and 533 of the Code define servitude and usufruct as follows:

"Art. 647. A real or predial servitude is a charge laid on an estate for the use and utility of another estate belonging to another owner."

"Art. 533. Usufruct is the right of enjoying a thing, the property of which is vested in another, and to draw from the same all the profit, utility and advantages which it may produce, provided it be without altering the substance of the thing."

These definitions describe exactly the right reserved by the Sallings. For, if the reservation was not of the ownership, it was of a right to enjoy a thing the property of which was vested in another, and it was a charge upon this property. This right, if not an ownership, was therefore a servitude, and a usufruct. Names do not change the substance of things. Calling this right by its generic name of real right, or giving it any other name, would not change its nature. It would continue to fall exactly and precisely within the definition of a usufruct, and be a usufruct, and nothing else.

Now the Code (article 606) provides that "The right of the usufruct expires at the death of the usufructuary," and (article 612) that, if granted to "corporations, congregations or other companies, which are deemed perpetual it lasts only thirty years."

Marcadé, commenting on article 617 of the Code Napoleon, which reads, "Usufruct is extinguished by the death of the usufructuary," says:

"Usufruct often ends before the death of the usufructuary, but it can never go beyond, and cannot be transmitted to his heirs. And necessarily so; its effect, being while it lasts to destroy the ownership (for the reason that ownership, when separated from the right to enjoy, has no longer any value except from the prospect and expectancy of the future extinction of the usufruct), could not be allowed to be perpetual or of too long duration. Hence the Code, conformably with the principles of the antecodal jurisprudence and of the Roman law, authorizes it only for the duration of the life of the usufructuary. The usufruct which should be constituted in favor of a person and his heirs would none the less be restricted to the life of this person."

The commentator goes on to explain that a usufruct can be constituted only in favor of a living person, not in favor of persons yet unborn.

Mourlon, on article 617, says:

"This cause of the extinction of the usufruct does not have its foundation in the presumed intention of the parties; it has its foundation in the very nature itself of the right of usufruct. The law has wished that it should be essentially temporary, and not transmissible to heirs, in order that it should not render the naked ownership a vain and useless right in the hand of the naked owner."

This court held, in Declouet v. Borel, 15 La. Ann. 606 (quoting syllabus):

"A clause, in an agreement establishing a usufruct, by which it is provided that such usufruct shall be hereditable, must be considered as not written."

It is said that this decision is founded on the Spanish law. But the language of the court shows differently:

"Under the Spanish law," says the court a usufruct "terminated at the death of the usufructuary, as under our own law."

Indeed, this principle, far from being peculiar to the Spanish law, has been fundamental from the origin of the law of usufruct:

"Finitur autem usufructus morte fructuarii." "Usufruct however comes to an end with the death of the usufructuary." Institutes of Justinian, book II, tit. IV, par. 3.

That usufruct necessarily expires with the usufructuary, and cannot, even by contract, be made to last longer, see 10 Demolombe, No. 248; 6 Laurent, No. 352; 2 Aubry and Rau (5th Ed.) No. 228; Bandry, Lacantinerie et Chauveau, Usufruct, No. 444; Dallox, Juris. Gen. v. Usufruct, Nos. 103 and 105.

Art. 758 of the Code reads:

"Art. 758. When the right granted is merely personal to the individual, it expires with him, unless the contrary has been expressly stipulated."

Usufruct is a personal servitude, and apparently, therefore, this article allows a usufruct to be stipulated for a time beyond the life of the usufructuary. But such is not the case. This article has reference to personal servitudes in general, and not to usufruct, which is governed by the special provision of article 606.

If, then, what the Sallings reserved was a servitude, it was a usufruct, and, as such, terminable with their lives, and, so far as I know, proportionately with the life of each one of them, so that, if all of them had happened to perish ten minutes after the signing of the act of sale, the right would have perished that soon.

But, if I am mistaken in this, and the only infirmity of the reservation lay in its liability to become extinguished for nonuser within 10 years, the situation is not changed, since the fact remains none the less patent that the parties did not intend that the reservation that was being made should be of a right to be exercised within 10 years under penalty of extinguishment, but manifestly intended that the Sallings should continue to own the oil and gas, and should continue so to own them indefinitely—that is to say, perpetually—without being under any limitation whatever as to the time within which to take them. It was not known that there were any minerals, and the reserve meant simply, and no more than, that, if at any time in the near or in the distant future minerals should be discovered under the land, they should belong to the Sallings. At that time there were no oil operators in that country, and no one was contemplating that any exploration (with its attending certain heavy expense and problematical success) would be undertaken in the near future. The Sallings surely were not contemplating any exploration, and they can hardly be supposed to have reserved a right terminable in 10 years which they had no idea of being able to exercise within that time.

This being so plain, I do not suppose there can be any necessity of enlarging upon it. In fact, I do not understand counsel as contending that the parties did not intend that the right reserved should be perpetual—but that, intending to reserve a perpetual right, they in fact reserved only a prescriptible one.

The intention of the parties having been to reserve a perpetual right, I think this intention must be given effect, for, in the matter of contracts, the intention of the parties is what governs. It is the law of the parties, and, if they bring their case before the courts, it is the law of the case.

The intention of the parties to a contract is to be gathered primarily from the wording of the contract; but the wording is merely a means of making known the intention, of serving as evidence of it, and the peculiarity of the wording becomes insignificant if the intention is otherwise definitely ascertained.

In this case the intention that the Sallings should continue to be the owners of the minerals, including the oil and gas, is unmistakable; no doubt at all is possible in the matter.

The difference in the phraseology of the two reservations becomes insignificant in the presence of the patent fact, which stares us in the face, that the intention of the parties was that the Sallings should continue to own all the minerals—oil, gas, and all—during their natural life, and transmit same to their heirs, without any necessity on their part to do any exploitation for preserving this ownership.

Learned counsel say that the only right which the Sallings had with reference to the oil and gas was to bore for and take them, and that, having no greater right than this, they could reserve no greater; so that, even if the act of sale had by its terms reserved the oil and gas themselves, and not merely the right to bore for and take them, the effect of the reservation would have been the same; the reservation would still have been merely of a real right upon the land, or, in other words, of a servitude.

No doubt, if the only right the Sallings had with reference to the oil and gas was to bore for and take them, they could reserve no greater right than this; but the fact of the matter is that they had a greater right than this; they had the perfect ownership of the oil and gas, as I have undertaken to demonstrate hereinabove.

The right to operate for the oil and gas was necessary to carry into effect the reservation made of the oil and gas, and therefore the reservation carried with it this right. This incidental right was expressly reserved in the act of sale; but, if no mention had been made of it, the legal situation would have been exactly the same, because the law would have read it into the contract, as a necessary incident to the reservation. This has been held in other states in the following cases: Ramey v. Stephney (Okl.) 173 Pac. 72; Curtiss v. Chartiers Co., 88 Ohio St. 594, 106 N. E. 1053; Chartier Coal Co. v. Mellon, 152 Pa. 286, 25 Atl. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645—and may be said to be statutory law in this state.

"Art. 1903. The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect."

The fact of this right having been expressly reserved in the contract adds nothing to the legal situation, and detracts naught from it, at any rate as between the Sallings and the Frosts, the parties to the contract, if the things reserved are considered as movables.

The situation, then, is that the Frosts contracted that the Sallings should be owners of this oil and gas, and should have the right to remove them, and, necessarily, to exercise the latter right in the manner sanctioned by "custom." Article 1903, supra. And the question is, What prescription, if any, is applicable to these rights thus vested by contract in the Sallings?

If, as contended by learned counsel of plaintiff, the effect of the reservation was to legally separate the oil and gas from the land, and thus mobilize them by anticipation, the situation was that within the land of the Frosts were some movables belonging to the Sallings which the Frosts had contracted the Sallings should have the right to take, and no time specified within which this right should be exercised.

Learned counsel cite decisions to the effect that trees sold for removal become movables, being mobilized by anticipation, and find complete analogy between such a case and that of oil and gas sold separate from the land, or reserved from a sale of the land. It may be this complete analogy does exist. But counsel go on and say that in such a case the right to remove the trees, if not exercised within a reasonable time, is ipso facto forfeited.

If so, on the question of what a reasonable time for the exercise of a reservation of oil and gas in an unproven field should be 100 years would come nearer the mark than 10.

But the rule is not that failure to exercise the right to remove trees within a reasonable time imports forfeiture. Certainly, where in the contract of sale a time limit has been fixed for the exercise of the right, this stipulation of the contract is the law of the case, and controls. And the doctrine of St. Louis Cypress Co. v. Thibodeaux, 120 La. 334, 45 South. 742, cited by learned counsel, goes no further than this.

The rule is, on the contrary, that, if trees are purchased for being removed, and no time has been fixed for their removal, and the parties cannot agree upon it, the owner of the land must apply to the courts to fix it. Shepherd v. Davis Bros., 121 La. 1011, 46 South. 999. But, as a matter of course, the courts enforce the contract as they find it, and therefore fix the time limit according to what was within the contemplation of the parties, and allow the time to be perpetual if such was the contemplation of the parties. 25 Cyc. 1553; 17 R. C. L. 1082.

As between the Sallings and the Frosts, there could be no question of servitude, but only a question of a contract binding the Frosts personally to allow the Sallings to take the oil and gas. No doubt, the right to go upon the land for taking the oil and gas was a servitude, but this right existed only as an incident to, or consequence of, the personal obligation of the Frosts; the cause of its existence was the obligation of the Frosts to allow the oil and gas to be taken, and, so long as this cause continued to operate, so long the effect of this cause—the right to go on the land—resulted and existed.

Using the same illustration of trees having been sold: The right to go upon the land for taking the trees would be a servitude, but it would be a servitude resulting from the personal obligation of the owner of the land to allow them to be taken, and, so long as this personal obligation continued to exist, so long would the servitude continue. The cause generative of the servitude would be operating constantly—constantly creating the servitude—thereby keeping it alive so long as the personal obligation lasted.

A servitude is a debt which the land owes. It is not possible to prevent prescription from running on this debt by agreement, because the benefit of prescription cannot be renounced in advance. C. C. art. 3460. If parties agree that prescription shall not run on the obligation which they are creating, the agreement stands as if not written. Therefore if, in the case of a sale of trees, the servitude for the removal of the trees did not result from the personal obligation to allow the trees to be removed, it would prescribe in 10 years (it being a discontinuous servitude), no matter what might be the time limit fixed in the contract for the removal of the trees. So that, although the purchaser had been accorded 20 years within which to remove the trees, his right to go upon the land for removing them would prescribe in 10 years, and with it, necessarily, would go his right to the trees, although some courts have sanctioned, I believe, the legal monstrosity of the purchaser in such a case owning the trees without the right to take them or to compel the owner of the land to deliver them or suffer them to be taken.

On the assumption of the Frosts having contracted that the Sallings should continue to own the oil and gas, and of these minerals having been thereby mobilized, the situation would not be different from that where the seller of a plantation had reserved from the sale some movables on the plantation—say the mules, or a pile of lumber or bricks, or a house without the ground upon which it stood. In such a case the situation would be that the purchaser of the plantation would have in his possession certain movables not belonging to him, and which he would therefore be under the personal obligation to either deliver to the owner or suffer the owner to take. On this obligation the prescription liberandi causa could not run, for, so long as the movables continued not to belong to this possessor of them, so long would the obligation to suffer the owner to take them continue. The only prescription that could operate in such a case would be that acquirandi causa, and it could be set a going only by the legal beginning of a possession as owner. Such a possession the purchaser of the plantation could start on its course only by conveying actual notice to his vendor that from now on he would hold the movables as owner. Without such notice his possession would continue to be precarious if it lasted a thousand years.

So much for the legal situation if the oil and gas are deemed to have been mobilized by anticipation.

If they have retained their quality of immovables, as being parts of the soil, the imprescriptibility of the right or servitude to operate upon the surface for taking them is equally plain. There would then be two immovables, or estates, situated one above the other—the lower of no use or value whatsoever without a servitude of passage or operation for oil and gas upon the upper. Between the legal situation of such a lower estate and that of an enclaved estate, the analogy would be complete, and therefore all the provisions of the Code with reference to enclaved estates would be applicable. These provisions are that the enclaving estate owes a servitude of passage (article 699) and that this servitude is imprescriptible (article 785).

"The right of passage is in itself imprescriptible. It suffices that the enclavement exist for the right to be acquired, and for the thirty year prescription not causing the loss of it." Fuzier-Hermann, Repertoire du Droit Français, Vo. Enclave, No. 186, citing Delvincourt; Marcadé; Demolombe; Aubry and Rau; Baudry, Lacantinerie et Chauveau; Gavani de Campile.

Domat, Les Lois Civiles, Liv. 1, tit. XII, § 1, says:

"This necessity makes law; it is of natural right that an estate do not remain useless, and that one owner should allow to his neighbor what he himself in the like situation would desire should be accorded to him."

It is this necessity which governs and regulates the situation. The extent of the servitude is therefore measured by the extent of the necessity. And it is that idea which has dictated article 762 of the Code. Speaking of the passage which article 699 has provided the enclaving estate should have to allow to the enclaved estate, article 702, says:

"Art. 702. A passage must be furnished to the owner of the land surrounded by other lands, not only for himself and workmen, but for his animals, carts, instruments of agriculture, and everything which may be necessary for the use and working of his land."

The law could not foresee what things might eventually turn out to be "necessary for the use and working of the land"; hence the couching of the provision in these general terms. The idea is that the enclaving estate must allow to the enclaved estate all that may be necessary for the working of the enclaved estate. This servitude would, of course, have to be exercised with due regard to the consideration which neighbors

owe to each other, and without prejudice to the upper estate, save in so far as may be absolutely required for the use of the lower estate according to equity and custom.

The sale of a tract of land does not carry with it the ownership of movables belonging to a third person which happen to be on or in land. The purchaser would have to allow these movables to be taken by their owner. On the assumption that the oil and gas were movables at the time of the sale to the Frosts, the Frosts would have to allow the Sallings to take them, and, necessarily, to allow the surface of the land to be used for that purpose. The most the Frosts could require would be that equitable indemnification be made for this use of the surface. Prescription liberandi causa could not apply. For, so long as the Frosts had on their land movables not belonging to them, they would be under the obligation of allowing the owner of these movables to take them. The prescription acquirandi causa is not pleaded, and, moreover, could accrue only if the possession of the surface carried with it possession of the oil and gas underneath, qua movables, and the authorities cited in the brief of the learned counsel for plaintiff would seem to show that it does not.

Whether the oil and gas were movable or immovables, therefore, the Sallings were entitled to have them, and to have the use of the surface for that purpose, and the assertion of that right was not a slander of plaintiff's title to the land; and these suits in slander of title have to be dismissed.

Oil and gas were unknown as subjects of ownership at the time of the adoption of our Code. How far, therefore, that kind of property would be subject to a strict application of the provisions of our Code may be a question. It would seem that a sale or reservation of these minerals might with equal show of reason be construed into a sale or reservation either of the minerals separate-ly from the land, or of the stratum containing them. If the contemplation of the contract was of a perpetual right, the construction of it might have to be that the bearing stratum was the thing sold or reserved; if, on the other hand, there was a limitation of time for removal, the construction would seem to have to be that the sale or reservation was of the minerals separate from the land. · But that point need not be decided in this case, as on either construction in this case the decision must be against plaintiff.

O'NIELL, J. (dissenting from the opinions submitted by the Chief Justice and by Mr. Justice PROVOSTY on rehearing). With great respect I say I do not find either in the opinion submitted by the Chief Justice or in the opinion submitted by Mr. Justice PROVOSTY, a sufficient reason for a reversal of the opinion and decree which we handed down in this case and in the companion case entitled Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co. (No. 22183) 88 South. 723,[1] a year and four months ago. When we rendered the opinion and decree in these cases, we had had them under consideration nearly a year. Separate opinions had been written and submitted by three members of the court before we adopted the opinion which was then handed down. The case had even been reopened for further argument, because the Chief Justice had not heard the original arguments; and we allowed unlimited time for argument on the second hearing of the case. The decision was therefore the result of more careful study and longer deliberation than has ever been given to any case that has come before this court, as far as I know.

The opinion and decree handed down in these cases a year and four months ago was only an affirmance of a doctrine which had been thoroughly established in the jurisprudence of this court; that is, that oil and gas,

---

[1] 149 La. 100.

while at large beneath the surface of the earth, are not subject to ownership, as physical or corporeal property, separate and apart from the land itself. It has been as well settled as any proposition could possibly be settled by the repeated decisions of this court—and there is not a decision to the contrary—that a contract purporting to sell or to reserve from a sale of a tract of land the oil and gas running at large beneath the surface, or supposed to be there, does not convey or reserve ownership of the physical or corporeal property in the oil or gas, separate and apart from the ownership of the land itself, but creates only a real right or servitude upon the land, to drill and explore for the oil and gas and to become the owner of such oil and gas as may be found and reduced to possession.

I cannot imagine a more important rule of property, the reversal of which could cause such grave injustice, than this rule of property which is so thoroughly established by the jurisprudence of this court. It is very probable that large investments have been made upon the faith of the well-settled rule of this court that a sale or reservation of the oil or gas beneath the surface of a tract of land conveys or reserves only a real right or servitude upon the land, which is extinguished by the prescription of 10 years if not exercised within that time.

The identical question presented in this case was presented to this court in Wadkins v. Atlanta & Shreveport Oil Company, decided in 1913. In that case it was held, in an opinion delivered by the then Chief Justice, concurred in by the present Chief Justice and by one of the present associate justices, that the reservation of the oil, gas and mineral deposits in an act of sale of the land was a reservation, not of the ownership of the mineral oil and gas themselves, but of a real right or servitude upon the land, in favor of the seller, and that the servitude was lost by the prescription of 10

years, because it had not been exercised within that time. The decision was not published officially, because a rehearing was granted, and, while pending on rehearing, the suit was settled by a compromise agreement between the parties. The decision, however, is as authoritative as is any other decision rendered by this court, because it has been cited with approval and as authority by this court many times, and it has never been overruled or disapproved.

In Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623, by Mr. Justice Sommerville, citing Wadkins v. Atlanta & Shreveport Oil & Gas Company, and the decisions of the courts of several other states, it was said:

"Oil and gas, while in the earth, are not the subject of ownership distinct from the soil; and a grant of the oil and gas therefore is a grant, not of the oil or gas that is in the ground, but of such part as the grantee may find, and passes nothing except the right to explore for the same under the terms of such contract."

In Cooke v. Gulf Refining Company, 135 La. 616, 65 South. 758, by Mr. Justice Sommerville, from whose opinion there was no dissent, it was said:

"That oil and gas in their natural state, under the surface of the ground, are not owned by the owner of the land, is held in a long line of decisions. Wadkins v. Atlanta & Shreveport Oil & Gas Company (No. 19315), not for publication; Rives v. Gulf Refining Company, 133 La. 178, 62 South. 623; Ohio Oil Company v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304; Westmoreland Gas Company v. De Witt, 130 Pa. 235, 18 Atl. 724, 5 L. R. A. 731."

In Elder v. Ellerbe, 135 La. 995, 66 South. 337, by the present writer, concurred in by every member of the court, it was said:

"In the case of Rives v. Gulf Refining Company, 133 La. 178, 62 South. 623, oil and gas beneath the surface of the earth, and not confined within a pipe or casing, were decreed to be a part of the realty, not subject to ownership separate from the land."

In Strother v. Mangham, 138 La. 437, 70 South. 426, a contract of sale purporting to "grant, bargain, sell, convey and deliver all of the oil [and] gas" under a tract of land described in the deed and belonging to the seller was held to be, not a conveyance of the oil and gas themselves, but a conveyance of only the right to the oil and gas that might be found and reduced to possession. The plaintiff in that case was the owner of the land, who had made the sale of the oil and gas; and his suit was to annul the sale on the ground that the oil and gas beneath the surface of the land were not subject to separate ownership, and therefore could not be sold separate and apart from the land itself. The court acknowledged the correctness of plaintiff's contention that the oil and gas were not subject to ownership separate and apart from the land itself, and that therefore the sale did not convey ownership of the oil and gas. But the court held that such a sale, purporting to convey title to the oil and gas, in reality conveyed only a real right or servitude upon the land. In the opinion delivered by the Chief Justice and concurred in by every member of the court it was said:

"The doctrine that the owner of land has no property right in the oil and gas beneath the surface until he has reduced it to possession in no manner denies to such owner the exclusive right to the use of the surface for the purpose of such reduction, or for any other purpose not prohibited by law, but, to the contrary, concedes that right, as inherent in the title to the land, and subject only to the control of the state, in the exercise of its police power; and the right may be sold, as may be any other right, and may carry with it the right to the oil and gas that may be found and reduced to possession. Ohio Oil Company v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623; Losecco v. Gregory, 108 La. 648, 32 South. 985; Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 South. 641."

In Saunders v. Busch-Everett Company, 138 La. 1049, 71 South. 153, a contract purporting to sell "all of the oil and gas in and under" the land of the seller was held to convey, not ownership of the oil and gas themselves, but merely the "right to explore for the oil and gas" and to become the owner of such oil and gas as might be found and reduced to possession. In the opinion delivered by the present Chief Justice and concurred in by every member of the court we undertook to put this important question at rest, once and for all, in this vigorous language:

"It has been held by this court, after mature deliberation (and we find no reason for changing our opinion), that:

" 'Oil and gas while in the earth are not the subject of ownership distinct from the soil; and the grant of the oil and gas therefore is a grant, not of the oil or gas that is in ground, but of such part as the grantee may find, and passes nothing except the right to explore for the same under the terms of such contract.' Rives et al. v. Gulf Refining Company of Louisiana, 133 La. 178, 62 South. 623.

"In the more recent case of Strother v. Mangham, 70 South. 426, ante, page 437, No. 21436 of the docket of this court, it was said:

" 'The doctrine that the owner of the land has no property right in the oil or gas beneath the surface until he has reduced it to possession in no manner denies to such owner the exclusive right to the use of the surface for the purposes of such reduction, or for any other purpose not prohibited by law, but, to the contrary, concedes that right, as inherent in the title to the land, and subject only to the control of the state, in the exercise of its police power; and the right may be sold, as may be any other right, and may carry with it the right to the oil and gas that may be found and reduced to possession.' "

In Hanby v. Texas Co., 140 La. 190, 72 South. 933, by the present Chief Justice, it was again held that a contract purporting to sell the oil and gas "supposed or hoped to be found beneath the surface of a particular tract of land" did not convey title to the oil or gas themselves, but conveyed only the real right or servitude to explore the land in search of those minerals and to become the owner of such as might be found and reduced to possession. It was said:

"Conceding that the sale of an interest in the oil or gas which may be discovered beneath the surface of a particular tract of land conveys no title to any specific oil or gas, it nevertheless carries with it the right to make use of the surface of the land for reduction to possession of the oil or gas that may be found; *and, in fact, the right last mentioned is alone conveyed in such case, since it is the only right, with respect to those fugitive products, that the owner of the land himself can be said to possess.* That right, however, he does possess, since it is a right of use, or of enjoyment, and hence a constituent of his title to the land, and, so possessing, he may dispose of it, since the three things, usus, fructus, and abusus, forming, in conjunction, full ownership, may be separated, and the title dismembered, and in that event the rights respectively resulting from such dismemberment retain the nature of the thing upon which they bear as though no dismemberment had occurred." (The italics are mine.)

In Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 South. 206, 5 A. L. R. 411, by Mr. Justice Provosty, it is said in the syllabus:

"An owner of land does not own the fugitive oil beneath it and cannot complain that it is being drawn off by a pump sunk by an adjoining landowner."

In the case last quoted plaintiff and defendant were, respectively, the lessees of adjoining tracts of land. Plaintiff had a well that was producing about 124 barrels of oil a day, by means of a standard pumping rig. Defendant sunk a well on the adjoining tract, about 400 feet from plaintiff's well. Defendant's well was a nonproducer and was abandoned. The open pipe admitted air into the underground regions and thereby greatly reduced the suction power of plaintiff's pump. It was discovered that, by closing the pipe on the abandoned well on defendant's land, the suction capacity of plaintiff's pump was restored. There was, therefore, no doubt that plaintiff was drawing the oil from defendant's land when defendant's pipe was closed, and was drawing air through defendant's pipe when it was open. Under these circumstances, this court

maintained the right of plaintiff to compel defendant, by a mandatory injunction, to close the well on defendant's land and allow plaintiff to draw the oil therefrom. In the course of the opinion it was said:

"Defendant does not contest the right of plaintiff to get out of its land all the oil it possibly can, and by means of a well, but contests plaintiff's right to do this by means of a pump, because a pump sucks the oil from under defendant's land. The argument is that plaintiff may appropriate the oil passing from defendant's land to plaintiff's, provided the oil passes, or flows, from the one tract to the other 'naturally,' that is, by gravity, and not as the effect of the use of artificial means.

"So far as artificiality is concerned, we do not see the difference between a well and a pump; both are artificial; both cause the oil to flow from the neighbor's land; and both produce that effect by creating a vacuum which the oil from the neighbor's land comes in to fill. In both cases the oil flows from the neighbor's land by gravity. The fact that some of the oil which plaintiff's pump is producing may come from defendant's land can make no difference; for in the case of a flowing well so close to the boundary line that one-half of its production would to a reasonable certainty be known to be coming from the adjoining tract the owner of this tract would hardly, we imagine, claim either the ownership of one-half of the oil or the right to close the well; and the reason would be that an owner of land does not own the fugitive oil beneath it so as to have the right to follow it after it has left his land."

The opinion last quoted was handed down less than a month after the present case and the companion case of Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co. were argued and submitted for decision. The three cases, each presenting the question whether the owner or lessee of the surface estate actually owned the mineral oil and gas beneath the surface, were all under consideration by the court at the same time. This case and that of Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co. were argued on the 8th and 9th of May, 1919, and were then submitted for decision. The question presented was of such vast importance, because the jurisprudence

had already established the rule of property affecting such enormous values, that the court allowed the attorneys unlimited time for oral argument, and their arguments consumed two days. Nineteen printed briefs, containing more than 400 pages, were filed by the attorneys on both sides and by others who appeared as amici curiæ. The decision in the case of Higgins Oil & Fuel Co. v. Guaranty Oil Co. was rendered on May 5, and a rehearing was denied on June 2, 1919. The author of the opinion in that case therefore had the benefit of the extensive arguments made and voluminous briefs filed in this and the other Frost-Johnson Case, and had the review of our jurisprudence fresh in mind, when he wrote the opinion in Higgins Oil & Fuel Co. v. Guaranty Oil Co. At the request of the attorneys on both sides of this and the other Frost-Johnson Case, the two cases were reopened for further argument, because the Chief Justice was not present when the cases were first argued. They were reargued on December 2, 1919, and the decisions were handed down on January 5, 1920; that is, a year and four months ago.

A review of the jurisprudence does not disclose a decision by this court contrary to the long list of decisions cited in our original opinion. Mr. Justice PROVOSTY intimates in his concurring opinion in this case that a contrary doctrine was announced in the case of De Moss v. Sample, 143 La. 243, 78 South. 482, and in Calhoun v. Ardis, 144 La. 311, 80 South. 548, and by this court's refusal of a writ of review in the case of Bradford v. Williams, decided by the court of appeal in June, 1916.

Our declining to issue a writ of certiorari or review or other supervisory writ in a case decided by a court of inferior jurisdiction is never regarded as affirming the decision upon its merits. It often happens that our refusal to issue such writs is because of an omission of the applicant to observe some rule of the court with regard to the affidavit to be made or documents to be annexed to the petition. And we very often refuse to exercise our supervisory jurisdiction in cases in which we would have decided otherwise if we had had appellate jurisdiction, provided that the court that rendered the decision was vested with jurisdiction and allowed due process of law. Our refusal to issue a writ of certiorari or review, or other supervisory writ, in any case, is nothing more than a refusal to entertain jurisdiction of the case. It is no more an expression of opinion on the merits of the case than a judgment dismissing an appeal. The refusal to issue a writ of certiorari or review in Bradford v. Williams was not intended as a departure from the doctrine so thoroughly established by the jurisprudence of this court. If the decision in that case and in the case of De Moss v. Sample and in the case of Calhoun v. Ardis were contrary to the long line of decisions which I have quoted, they ought to be regarded as having been overruled by the later decision handed down by Mr. Justice Provosty in Higgins Oil & Fuel Co. v. Guaranty Oil Co., and by the decision subsequently handed down in the present case, and in the companion case, Frost-Johnson Lumber Co. v. Nabors Oil & Gas Company.

It is unreasonable, however, as was pointed out in the original opinion in this case, to say that the decision in De Moss v. Sample or in Calhoun v. Ardis was contrary to the otherwise well-established jurisprudence of this court upon the subject of ownership of oil and gas. In neither of those cases was the question presented for decision. In each case the question was, simply and solely, whether a grantor of a tract of land could validly reserve to himself the exclusive right to explore for oil and gas. The contention of the purchaser of the land was that the reservation of the right to explore for oil and gas was not valid, because the deed did not contain the statement that a consideration was paid for the reservation. Of course,

there was no merit whatever in the contention, and it could have been disposed of by the simple statement that it was not necessary that the seller should pay a consideration for what he had already bought and paid for and was not then selling.

In De Moss v. Sample the reservation in contest was of "the oil, gas and mineral rights in and to the said described property, * * * such right to be exercised with as little damage as possible in the operation thereof," etc. There was no dispute that the words "oil, gas, and mineral rights" merely described the rights which were reserved. The writer of the opinion used the expression "minerals" and "mineral rights" indifferently, as if they were synonymous terms, because the question whether they were synonymous terms was not at all relevant to the issue before the court and was not thought of. The opinion was written by Mr. Justice Sommerville, who had also written the opinion in Rives v. Gulf Refining Company, 133 La. 178, 62 South. 623, and in Cooke v. Gulf Refining Co., 135 La. 616, 65 South. 758, quoting with approval Wadkins v. Atlanta & Shreveport Oil & Gas Company, and Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729. It is quite certain that Mr. Justice Sommerville did not intend to overrule his previous decisions on this subject, because he cited them with approval, and quoted also with approval Hanby v. Texas Co., 140 La. 189, 72 South. 933, in which the Chief Justice had quoted with approval the two previous decisions handed down by Mr. Justice Sommerville. And he, in turn, afterwards concurred in the opinion handed down by Mr. Justice Provosty in Higgins Oil & Fuel Company v. Guaranty Oil Company. It is therefore quite unreasonable to believe that Mr. Justice Sommerville intended that any expression of his in De Moss v. Sample should be regarded as overruling his previous decisions on this important subject.

The opinion in Calhoun v. Ardis was written by Mr. Justice Leche, who was serving pro tempore to fill a vacancy caused by the death of Mr. Justice Land. The decision merely affirmed the ruling in De Moss v. Sample. In Calhoun v. Ardis, the grantor of the land had merely reserved "all the mineral rights under said property with the right of entry upon said property for the development of same." The reservation is quoted in the opinion. Hence it could not have been decided, and in fact it was not contended, that the grantor of the land had reserved the ownership of the oil and gas. The only issue that was presented or decided is stated in the opinion thus:

"Plaintiff states that there was no consideration passed from Ardis to himself for the mineral rights which the former retained under the cited clause of the act of sale."

I have taken the trouble to examine the pleadings in the record of the case of Calhoun v. Ardis, in the archives of this court, and I find that in article IV of his petition Calhoun alleged that the reservation made by Ardis was in the following language, quoted in the petition, viz.:

"It is further agreed and understood that the vendor herein retains all the mineral rights under said property and with the right of entry upon said property for the development of same."

I also find that in paragraph IV of his answer to the suit Ardis answered the allegation in the corresponding article of Calhoun's petition thus:

"In answer to this paragraph of plaintiff's petition, your respondent admits that he retained the mineral rights in and under said property, in said deed, by the clause from same copied in said paragraph."

It is therefore wrong to say that this court decided in Calhoun v. Ardis or in De Moss v. Sample that the grantor of a tract of land could reserve the ownership of the physical or corporeal property in the oil and gas separate from the ownership of the land itself.

150 La.—27

The question was not at issue in either case, and therefore could not have been decided in either case. The use of the word "minerals" by the authors of those opinions as if the word were synonymous with the expression "mineral rights" was only a lapsus, of no importance whatever, on the part of the authors of those opinions. I cannot possibly understand why this court should now cite De Moss v. Sample or Calhoun v. Ardis as cases in which this important question was decided, in view of the fact that the question was not propounded in either of those cases. If the question had been presented, we would have been compelled to either affirm or overrule the long line of decisions which we had rendered in cases in which the question had been squarely presented and deliberately decided.

Except for the question of prescription, the question whether the owner of a tract of land owns the physical or corporeal property in the oil and gas running at large beneath the surface, or owns merely the exclusive right to drill and explore for the oil and gas and to become the owner of such oil and gas as he may find and reduce to possession, is a matter of no importance whatever. It was so treated or ignored in the case of De Moss v. Sample and in Calhoun v. Ardis. Except for the question of prescription, the ownership of the exclusive right to drill and explore for oil and gas and to become the owner of all oil and gas that may be found and reduced to possession on the land of another person is the same as the ownership of the oil and gas running at large beneath the surface of the land of the other person. I imagine, therefore, that laymen who have read the newspaper comments upon the importance of the case now before us, and who are not aware of the question of prescription, are apt to recall the familiar lines of the famous stenographist, Byron, "Strange all this difference should be 'twixt tweedledum and tweedledee."

But the question is indeed an important one, with reference to the plea of prescription. A reversal of the rule of property on this momentous subject would inflict serious loss upon all investors who have relied upon the many decisions of this court, which were regarded as having settled the question finally. Investors who have relied upon the consistent rulings of this court that all that can be bought or reserved with regard to oil and gas is the real right or servitude to drill and explore for them, and who have therefore bought or reserved such real right instead of buying or reserving the oil and gas themselves, will suffer the loss of their right by 10 years' prescription. Investors who have acted contrary to the jurisprudence of this court and who have bought or reserved the oil and gas themselves, supposed to be under the land of another person, will be rewarded by having something which they can never lose by prescription, even though they may never see fit to exercise their right. There can be no doubt about that, because the members of this court are yet unanimous in their opinion that a sale or reservation of the exclusive right to drill and explore for oil and gas in or under the land of another person creates only a servitude, which is lost by the prescription of 10 years, if not exercised within that time.

A reversal of our jurisprudence on this subject would have even a worse effect than I have yet mentioned. It would seriously endanger the validity of our conservation laws on the subject of oil and gas, our severance taxes, and the contemplated laws to forbid or regulate the manufacture of carbon black from natural gas. It has been decided by the Supreme Court of the United States, inferentially, if not expressly, that the Legislature of a state in which the court of last resort recognizes a right of private ownership in oil and gas running at large or supposed to be beneath the surface of the earth is forbidden by the Fourteenth Article of

Amendment of the Constitution of the United States to enact a law interfering with the right of the owner to dispose as he sees fit to dispose of his oil and gas.

The conservation law of this state on the subject of oil and gas is Act 190 of 1910, p. 313, which was copied literally from the Indiana statute (Acts 1893, p. 300), the constitutionality of which was attacked in the case of Ohio Oil Company v. Indiana. In that case the Supreme Court of the United States declared the Indiana statute valid, not violative of the Fourteenth Amendment of the Constitution of the United States, because, as the court said:

"The doctrine that a landowner, although entitled to bore wells for natural gas and oil, has no title to those substances as owner until they are actually reduced by him to possession, is settled as a rule of property in the state of Indiana."

The statute of Indiana from which the Act No. 190 of 1910 of this state was copied made it a penal offense for any one having possession or control of a gas or oil well to allow the gas or oil to escape for a longer period than two days after having struck oil or gas in the well. The Attorney General of Indiana filed a complaint against the Ohio Oil Company in the circuit court of Madison county, Ind., and obtained a temporary injunction restraining the defendant from permitting the gas which was escaping from five of the company's wells to escape into the open air. The defendant demurred, averring that the complaint did not disclose a cause of action. The demurrer was overruled. Defendant, answering the complaint, alleged that the mineral oil and natural gas beneath the surface of the land belonged to the company even before such oil and gas were reduced to possession or brought under control, that the gas which was escaping was actually being utilized for the purpose of forcing the oil to the surface, and that therefore an enforcement of the statute which undertook to control the owner of the oil and gas in the manner of disposing of his own property would be a taking of his property without compensation, and would deprive him of his property without due process of law, in violation of the Fourteenth Amendment. To this answer the state demurred, saying that the facts alleged in the answer were not sufficient to constitute a defense. The state's demurrer was sustained. On defendant's refusal to answer further a decree was entered making the injunction permanent. On appeal to the Supreme Court of Indiana the decree was affirmed. Defendant then brought the case to the Supreme Court of the United States on a writ of error.

The Supreme Court of the United States found that the question of constitutionality of the statute depended mainly, if not entirely, upon the question whether the oil and gas, before being reduced to possession or brought under control by the owner or lessee of the surface estate, could be the subject of private ownership. The Chief Justice, for the court, stated and answered the proposition thus:

"The proposition, then, which denies the power in the state to regulate by law the manner in which the gas and oil may be appropriated, and thus prevent their destruction, of necessity involves the assertion that there can be no right of ownership in and to the oil and gas before the same have been actually appropriated by being brought into the possession of some particular person. But it cannot be that property as to a specified thing vests in one who has no right to prevent any other person from taking or destroying the object which is asserted to be the subject of the right of property."

The court then announced that the right, which is universally recognized, of a landowner to extract, by boring wells on his own land, and appropriate to his own use without compensation to his neighbor, the oil or gas in a natural reservoir beneath the surface, extending beyond his property line, was not consonant with the right of ownership

of the oil and gas running at large beneath the surface, as the word "ownership" is universally defined.

The test which the court then applied in determining whether oil and gas, while running at large beneath the surface of the earth, could be the subject of private ownership, was the definition of ownership, substantially as it is written in article 488 of the Civil Code of Louisiana, viz.:

"Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons."

And the court concluded that mineral oil and gas, while at large beneath the surface of the earth, did not, and in their very nature could not, except perhaps by a legislative fiction, belong to some one in particular, to the exclusion of all other persons.

The court then reviewed the decisions of the Supreme Court of Indiana, and declared the law of that state to be "in accord with the general law," as follows:

"Although, in virtue of his proprietorship, the owner of the surface may bore wells for the purpose of extracting natural gas and oil, until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession. It is also clear from the Indiana cases cited that, in the absence of regulation by law, every owner of the surface within a gas field may prosecute his efforts and may reduce to possession all or every part, if possible, of the deposits without violating the rights of the other surface owners."

It is absolutely certain that the decisions of this court on this subject have also been heretofore "in accord with the general law" that oil and gas at large beneath the surface of the earth are not, and in their very nature cannot be, the subject of ownership, separate and apart from the ownership of the land itself.

In the opinion delivered by the Chief Justice of the United States Supreme Court in Ohio Oil Co. v. Indiana, the case of Westmoreland, etc., Natural Gas Co. v. De Witt, 130 Pa. 235, 18 Atl. 724, 5 L. R. A. 731, was cited as authority for the doctrine that mineral water and gas and oil belong to the owner of the land and form a part of it so long as they are on or in it and subject to his control, but when they escape and go into other land, or come under another's control, the title of the former owner is gone. In that connection, I beg leave to call attention to the fact that the Supreme Court of Indiana, in the later case of State v. Ohio Oil Co., 150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627, denied that, in quoting in its previous decisions from the case of Westmoreland, etc., Co. v. De Witt, it had adopted as the law that part of the decision of the Pennsylvania court which had held that the mineral water, gas, and oil belong to the owner of the land and are part of it so long as they are on or in it and are subject to his control, but that, when they escape, and go into other land, or come under another's control, the title of the former owner is gone.

Of course, it is possible that the Supreme Court of the United States might have declared the Indiana statute constitutional upon the theory of joint ownership in the proprietors of the surface above an oil pool or gas pocket. But the fact is that the decision was not based upon that theory. Under our system of law it would be utterly impossible to say that the owners of the surface above an oil pool or gas pocket are joint owners of the oil in the pool or gas in the pocket, because the Civil Code declares that there can be no such thing as joint ownership except in fixed or definite proportions. Article 488 of the Code declares that it is of the essence of the right of ownership that it cannot exist in two persons for the whole of the same thing, although they may be the owners of the same thing in common, each for the part that he may have therein. To say that the surface owners above an oil pool or gas pock-

et own the oil and gas, not in fixed or definite proportions, but with the right of any one of them to take and appropriate to his own use, without compensation to the other surface owners, all that he sees fit to take of the oil or gas beneath the surface, is nothing more nor less than to say that each surface owner owns, not any particular part or proportion of the oil or gas, but merely the right to take and appropriate to his own use whatever oil or gas he may reduce to possession by drilling wells on his own land. The right in such case is therefore not ownership of the oil or gas, or of any part of it, but is merely the right to become the owner of such part of the oil or gas as may be reduced to possession by drilling on one's own land. But, as was said in Ohio Oil Company v. Indiana, the right to become the owner of a thing by reducing it to possession must not be confused with the right of ownership itself.

In the case of Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160, plaintiff sought to restrain the officials of the state of New York from enforcing against the gas company a statute making it unlawful to pump from wells or otherwise to draw by artificial means mineral water holding in solution carbonic acid gas, "for the purpose of extracting, collecting, compressing, liquifying or vending such gas as a commodity otherwise than in connection with the mineral water." The gas company alleged that the gas could not be brought to the surface except by means of a pump or other artificial appliance; that the company was the owner of the carbonic acid gas in the water, and therefore had the absolute right to dispose of the gas as the company saw fit, and to waste the water if the company saw fit; and that an enforcement of the statute would deprive the company of its property without compensation, in violation of the Fourteenth Amendment of the Constitution of the United States. The basis of the company's contention was that the company, being the owner of the land, owned everything beneath the surface that it could reduce to possession. The Supreme Court answered by saying that the postulate asserted by the gas company was the same that had been asserted in Ohio Oil Company v. Indiana; and the court rejected the postulate on the authority of that case, saying:

"Were the question an open one, we should still solve it in the same way."

In the case of Walls v. Midland Carbon Co., 254 U. S. 300, 41 Sup. Ct. 118, 65 L. Ed. 276, decided by the United States Supreme Court on the 13th of last December, the object of the suit was to restrain the Attorney General and other officers of the state of Wyoming from enforcing or attempting to enforce a conservation statute of that state. The first section of the statute made it a penal offense to use, consume or burn natural gas without fully and actually applying and utilizing the heat therein contained for other manufacturing or domestic purposes, if the gas well or source of supply was located within 10 miles from any incorporated town or industrial plant. The second section of the statute made it a penal offense for any owner, lessee or manager of a gas well to use, sell or distribute natural gas for the purpose of manufacturing or producing carbon black or other resultant products from the burning or consumption of natural gas, without the heat therein being fully and actually utilized for other manufacturing or domestic purposes. The Midland Company had, before the enactment of the statute, erected a factory for the manufacture of carbon black, which factory was within 10 miles of an incorporated town and had cost $375,000. Its daily capacity was 13,000 pounds of carbon black, sufficient to manufacture 117,000 pounds of printing ink. From the gas consumed in

making the carbon black the company extracted about 1,600 gallons of high gravity gasoline per day. The carbon black and gasoline produced were worth several times what the gas consumed would have been worth for other manufacturing or domestic purposes. The Occidental Oil & Gas Company, whose business was an inseparable part of that of the Midland Oil Company, owned the land on which were located the gas wells that supplied the plant of the carbon company with the gas from which it manufactured the carbon black. The Occidental Company also owned and operated the pipe line by which the gas was conveyed to the factory, and received a royalty of one-half of the gasoline extracted in the process of manufacturing the carbon black. The Occidental Company also owned leases covering 1,200 acres near the plant in the proven gas field. The injunction suit was founded upon the contention that the plaintiff owned the gas beneath the surface of the land, and therefore had a right to utilize it as the company saw fit. On the authority of the decision in Ohio Oil Co. v. Indiana and the decision in Lindsley v. Natural Carbonic Gas Co., the Supreme Court of the United States declared that the owner or lessee of the surface did not own the gas beneath the surface until it was reduced to possession or brought under control by the owner or lessee of the surface. The court therefore held that the Wyoming statute did not interfere with the ownership of private property or violate the Fourteenth Amendment.

I assume, therefore, that, if we should now reverse the jurisprudence of this state and declare that the owner of the surface does own the oil or gas beneath the surface before he has reduced it to possession, there will be grave danger that the Supreme Court of the United States will declare that the conservation law of this state, being an exact copy of the statute which was put to the test in the case of Ohio Oil Company v.

Indiana, does attempt to interfere with a person's right to dispose of his own property as he sees fit. It will not do to say that the Supreme Court of the United States may find some other ground upon which to declare the statute of this state valid. In the case of Walls v. Midland Carbon Co., decided last December, the Chief Justice and two Associate Justices of the Supreme Court of the United States, being of the opinion that the statute of Wyoming was unconstitutional, dissented from the majority opinion. It is not reasonable to assume that they based their dissent upon the doctrine that oil and gas, while at large beneath the surface of the earth, are the subject of private ownership, because the opinion to the contrary in Ohio Oil Company v. Indiana was written by the Chief Justice and concurred in by every member of the court. The probable reason for the dissent of the Chief Justice and the two associate justices in Walls v. Midland Carbon Co. was that the company did reduce to possession the carbon black and the gasoline which were extracted from the gas, and that it was impossible to manufacture carbon black and at the same time utilize all of the heat contained in the gas consumed, and was therefore impossible to comply with the statute, in the manufacture of carbon black. I assume that such a statute could not stand the test in a state in which the local court of last resort would maintain that the owner of the surface of a tract of land owns absolutely the oil and gas beneath the surface, before it is reduced to possession or brought under control.

A reversal of the judgment which we rendered in this case, and in the companion case of Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co. a year and four months ago, and a consequent reversal of the well-settled jurisprudence on which those decisions were based, I say with respect, would not be justified by any reason given in either the opinion

submitted by the Chief Justice or in the opinion submitted by Mr. Justice PROVOSTY.

The quotation taken by Mr. Justice PROVOSTY from the article in the Michigan Law Review is neither evidence nor legal authority for this case. The article was written by an attorney at law, not a geologist, and was only a part of his argument in support of his idea, which is contrary to that of the United States Supreme Court and that which has been heretofore consistently expressed by this court, as to whether oil and gas are not subject to private ownership before they are reduced to possession.

With regard to the quotation taken from Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304, quoting in turn an Indiana case, quoting in turn a Pennsylvania case, I have already pointed out that the Supreme Court of Indiana has since declared that it did not adopt the doctrine of the Pennsylvania court that petroleum gas and oil belong to the owner of the land and are a part of it so long as they are on it or in it, etc.

I adhere to the view expressed in our original opinion in this case that it is mere choplogic to say that, as "the ownership of the soil carriers with it all that is directly above and under it," therefore the ownership of the soil carriers with it all things that are not otherwise susceptible of ownership, so long as they are above or under the soil. The last paragraph of article 505 of the Civil Code makes it very plain that, with regard to mineral oil and gas and subterranean water, the owner of the surface does not own them, but has the right to explore for them and to become the owner of all that he may reduce to possession, subject to such modifications as may result from the laws and regulations concerning mines. If it were not so—that is, if ownership in oil and gas and mineral water underneath the surface is vested in the owner of the surface by the language of the first paragraph of article 505—what reason was there for inserting the third paragraph, expressly permitting the owner of the surface to dig as deep as he deems proper and to draw from the lower regions "all the benefits that may accrue."

Mr. Justice PROVOSTY argues that oil and gas, while at large beneath the surface of the earth, ought to be subject to private ownership, because pigeons, bees and fish are by statute made the subject of private ownership; and he quotes article 519, viz.:

"Pigeons, bees or fish, which go from one pigeon house, hive or fishpond, into another pigeon house, hive or fishpond, belong to the owner of those things; provided, such pigeons, bees or fish have not been attracted thither by fraud or artifice."

What the article means and says is that, when pigeons, bees or fish go from one place of abode to another, they belong to the owner of their new place of abode, provided they have not been attracted there by fraud or artifice.

The reason why they, while at large, are subject to private ownership, is that the statute declares them so. There might have been as good reason for the lawmakers to declare oil and gas and mineral water while running at large beneath the surface of the earth, the subject of private ownership, as there was for declaring pigeons, bees, and fish the subject of private ownership. But the fact is that the lawmakers did not include mineral oil or gas or mineral water in the category of pigeons, bees, and fish. And the article referring to pigeons, bees, and fish contains a very strong reason why we cannot include mineral oil and gas in the same category with them. The article declares that a person cannot become the owner of pigeons, bees, or fish by attracting them to his pigeon house, beehive, or fishpond by fraud or artifice. On the other hand, the doctrine is recognized, not only

by the settled jurisprudence of this court, but universally, that a man can become the owner of the oil and gas beneath the land of another, by coaxing it from under the land of his neighbor, even by such artifice as a force pump. That doctrine is expressly recognized in the opinion written by Mr. Justice Provosty in the case of Higgins Oil & Fuel Company v. Guaranty Oil Company, decided after the present case was submitted for decision. The doctrine cannot possibly be reconciled with the doctrine that the owner of the surface of a tract of land owns the oil and gas running at large beneath the surface.

The fact that oil and gas are a very valuable commodity is a matter of no importance whatever. Except for the question of prescription, the ownership of the exclusive right to drill and explore for oil and gas under a particular tract of land, and to become the owner of all that may be found and reduced to possession, is just as valuable as would be a fictitious ownership of the oil and gas beneath the surface. The Chief Justice and Mr. Justice PROVOSTY, in the opinions which they have submitted, recognize that a contract conveying or reserving the exclusive right to explore for the oil and gas beneath a particular tract of land creates a servitude upon the land, which is lost by prescription if it be not exercised within 10 years. If a landowner should sell to his neighbor the exclusive right to the mineral water under the seller's land, the contract would, of course, create a servitude upon the land, which servitude would be lost by prescription if not exercised within 10 years. If the contract should be so worded as to purport to sell the mineral water running at large beneath the surface, or supposed to be there, it would not alter the substance or effect of the contract, or prevent the servitude from prescribing in 10 years. What difference is there, in principle, between a servitude to draw mineral water and a servitude to draw mineral oil or gas from beneath the surface of a tract of land? It will not do to say that mineral oil and gas are more valuable than mineral water. They are all articles of commerce, and, under particular circumstances, if not generally speaking. the mineral water is the most valuable of the three. They were all classed alike in the three decisions rendered by the Supreme Court of the United States on this subject, Ohio Oil Co. v. Indiana, Lindsley v. Natural Carbonic Gas Co., and Walls v. Midland Carbon Co.

I cannot see how it imposes any hardship upon the owner of a right to extract the mineral oil or gas from the land of another to require that he shall exercise his right within 10 years or allow it to go back into commerce. That has been the law of this state from the beginning of her history. Those who have invested in such rights have done so knowing the law. If the law should be changed now by a reversal of the judgment which we rendered in this case a year and four months ago, it would not only inflict serious loss upon all investors who have had faith in our jurisprudence, but would also tend to paralyze the oil and gas industry of this state; for it would recognize a species of perpetual incumbrance upon real estate which has never yet found an abiding place in our civil law system.

There is nothing new in the general proposition quoted by Mr. Justice PROVOSTY from article 496 of the Civil Code that the ownership and the possession of a thing are entirely distinct, and that the right of ownership may exist independently of the exercise of it. That article is in the chapter headed "General Principles." It is, of course, subject to the special provisions with regard to prescription. The general statement that the ownership of a servitude may exist without the exercise of it is not a denial of the special provision that, if it be

not exercised within 10 years, it shall be forfeited or lost by prescription.

Mr. Justice PROVOSTY virtually concedes that a contract purporting to sell the oil and gas supposed to be under a tract of land is merely a sale of the hope of finding the oil and gas. That is exactly what was said in Cooke v. Gulf Refining Co., 127 La. 592, 53 South. 874. A sale purporting to convey the oil and gas beneath the seller's land is a sale, not of the oil and gas themselves, but of the incorporeal right or hope of finding the oil, "together with the right to have" what gas and oil may be found and reduced to possession. The doctrine is illustrated in the opinion in that case by quoting the illustration in article 2451 of the Code of a fisherman selling the result of a haul of his net before casting it.

It is certain that, if a landowner should make a contract purporting to sell on terms of credit all of the oil and gas beneath his land, and the purchaser should find none there, the buyer's obligation to pay would remain as valid as if he had found millions of dollars worth of oil or gas; and the only reason why it would be valid is that the purchaser would not have bought the oil or gas itself, but would have bought only the incorporeal right or hope of finding them.

Mr. Justice PROVOSTY says in his opinion that the Sallings must have intended to reserve a perpetual right to the oil and gas; that is, a right that would never be lost by prescription. A simple answer to that statement is that the parties must have intended that the right should be exercised within the time in which the law required it to be exercised, to avoid its being lost by prescription. It matters not, however, what the parties intended in that respect, because article 3549 of the Civil Code declares that prescription liberandi causa cannot be waived in advance of its having accrued. The law declares that such prescription shall run not-

withstanding the voluntary declaration of the obligor to the contrary. Such prescription may be interrupted by an acknowledgment of the obligor, in which case it starts anew from the date of interruption. That is what we decided in Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co. (No. 22183) 88 South. 723.[2] It is surely a matter of no importance whether the parties to the contract in which the mineral rights in question were reserved did or did not intend that the right should be subject to the law of prescription liberandi causa.

In the opinion submitted by Mr. Justice PROVOSTY, as well as in that which has been submitted by the Chief Justice, the right to drill and explore for the oil and gas, and to become the owner of what oil and gas may be found and reduced to possession, is regarded as a mere incident of the ownership of the oil and gas themselves. On that premise it is argued by the Chief Justice and by Mr. Justice PROVOSTY that the surface estate owes a perpetual servitude to the corporeal or physical property in the oil and gas. In support of the proposition, articles 653 and 795 are cited, which declare that a predial servitude which results from the relative situation of the servient estate to the dominant estate is not subject to prescription "so long as no change takes place in regard to the two estates, whatever change may take place in the owners." Those two articles, as the Code expressly declares, pertain only to predial servitudes, or "charges laid on an estate for the use and utility of another estate, belonging to another owner." The articles have nothing to do with servitudes in favor of persons. To argue that the servient estate owes a perpetual servitude to the oil and gas beneath the surface is a begging of the question whether the oil and gas beneath the surface, or supposed to be there, are subject to ownership, as physical

---

[2] 149 La. 100.

or corporeal property, separate and apart from the ownership of the land itself. If it be decided that the oil and gas in that situation are subject to separate ownership, as physical or corporeal property, there is no reason whatever for saying that the surface estate owes a perpetual servitude to the oil and gas to allow the owner of the latter to bring it to the surface. For it is too well settled now to admit of argument that the ownership of physical or corporeal property cannot be lost by prescription liberandi causa, by the failure of its owner to have it in his possession for ever so long a time. See Harang v. Golden Ranch Land & Drainage Co., 143 La. 983, 79 South. 768.

The reason why oil and gas, as property, while running at large beneath the surface of the earth, are not subject to the laws of prescription relating to the possession of property, is that oil and gas, while running at large beneath the surface of the earth, are not susceptible of possession or dominion of any character, separate and apart from the possession of, or dominion over, the land itself. It would be absurd for the law to establish rules of prescription relating to a man's possession of oil and gas at large beneath the surface of the land of another person or supposed to be there.

The majority members of the court are now reversing our original judgment herein, not only upon the question whether oil and gas, while at large beneath the surface of the earth, are subject to ownership separate and apart from the land, but also upon the language of the reservation in the act of sale in question. In the original opinion handed down in this case we found that, although the sellers of the land reserved ownership of the solid minerals, they did not even pretend to reserve ownership of the oil and gas, but reserved merely "the exclusive right and privilege to enter upon the land * * * and bore and explore for gas and oil and to utilize and sell the gas and oil that might be found or discovered in said lands," etc. We found that that clause in the reservation would have been altogether superfluous and without meaning if the parties had intended that oil and gas should be included in the original reservation of the minerals described as coal, fossils and precious stones, and other solid minerals, or minerals in place, ejusdem generis. In reserving merely the right to explore for oil and gas, instead of undertaking to reserve absolute ownership of the oil and gas, the parties were observing the law which has been thoroughly established by the jurisprudence of this court, that the oil and gas while at large beneath the surface, are not subject to ownership separate and apart from the land.

The Chief Justice, in the opinion submitted by him, invokes certain general rules for the interpretation of doubtful contracts, such as the rule stated in articles 1950, 1955, and 1903 of the Civil Code, that—

"When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms."

That rule pertains to doubtful contracts generally. In interpreting a contract of sale, why should we not invoke the rule applicable particularly and especially to contracts of sale, viz. article 2474 of the Civil Code, which declares:

"The seller is bound to explain himself clearly respecting the extent of his obligations; any obscure or ambiguous clause is construed against him."

Bear in mind it was the Sallings who sold the land to the Frosts. If the language of the reservation of the "exclusive right and privilege to enter upon the land * * * and bore and explore for gas and oil," etc., is at all doubtful, or obscure or ambiguous, and if it be possible that the intention was

to reserve absolute ownership of the oil and gas, the doubt or obscurity or ambiguity must be construed against the Sallings heirs. I do not have any doubt that the language of the contract reserved only the exclusive right to drill and explore for the oil and gas, and did not reserve or attempt to reserve ownership of the oil and gas under or supposed to be under the surface of the land they sold. It appears to be conceded in the majority and concurring opinion that there is no doubt that the sellers reserved absolute ownership of the oil and gas under or supposed to be under the land they sold. If there was no doubt about that in the mind of the majority members of the court they would not have subscribed to the original opinion handed down in this case. The doubt ought to be resolved in favor of the buyer, as the Civil Code requires.

I do not concur in the opinion submitted by the Chief Justice, with regard to plaintiff's pleadings, viz.:

"The pleadings in the case, therefore, present no issue upon the susceptibility vel non of oil and gas to ownership, but, to the contrary, concede the susceptibility, invoke the action of the court upon the question whether the ownership is vested in plaintiff or defendants, and leave no room for either argument or action upon the question of susceptibility vel non."

It would seem strange indeed if we should find now, after having had this case under advisement for two years, that the issue which has been so thoroughly and so ably argued by so many attorneys, and on which we have written several opinions, is not presented at all for decision.

In support of my opinion that the attorneys for the plaintiff in this case did not, in their plea of prescription, acknowledge that plaintiff had no cause or right of action, I now quote the plea of prescription in full, viz.:

"In the above numbered and styled cause, now comes the plaintiff, Frost-Johnson Lumber Company, and shows:

"That all of the defendants are claiming rights to the minerals in and under the property in litigation herein, under the stipulation in the deed of date July 2, 1903, from Ernest N. Salling and Lottie A. Salling to E. A. and E. W. Frost, wherein said vendor purported to reserve to himself the right to exploit the said land for and to take the minerals therefrom; that all of the rights reserved by the vendor in said instrument were real rights in said land or servitudes thereon; that no attempt was made within 10 years from the date of said deed to exercise any of said rights; and that the same are therefore now barred by the prescription of 10 years liberandi causa, which prescription plaintiff now pleads in bar of any rights of the defendants and as perfecting the absolute and unconditional ownership of plaintiff in all of said property.

"Wherefore plaintiff prays that this plea of prescription be maintained, and for general relief," etc.

It is worthy of note that a regular two months' session of the General Assembly has been held since we handed down our opinion in this case and in the companion case of Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co.; and a constitutional convention has been in session now two months. Yet no change whatever has been made in the provisions of the Civil Code as we interpreted them in those two cases, and as we had been interpreting them since we rendered the decision in Wadkins v. Atlanta Oil & Gas Company, eight years ago. It is quite certain that the lawmaking power would have corrected our error, if it had been thought that we were in error, in our interpretation of the articles of the Code.

It is not likely that a reversal of the judgment which we have rendered in this case, by a reversal of opinion of only one member of the court, would warrant the members of the legal profession in advising their clients, or in believing themselves, that the decision of this case would be a better guide than our past jurisprudence to the contrary. Any change in the personnel of the court would be

apt to cause the court to advert and adhere to the past jurisprudence. It is well known that the constitutional convention now in session is making provision for at least three new members to come upon this bench. Besides, a successor to Mr. Justice PROVOSTY has already been elected; in fact, he was elected before the constitutional convention was called, and will take his seat within the year. Although the opinions of the court over which Mr. Justice PROVOSTY'S successor has been presiding are not officially published, it is a matter of public record and of general knowledge that, before we handed down our original opinion in the present case, Mr. Justice-Elect Overton followed our previous jurisprudence, and held that oil and gas at large beneath the surface of the earth were not subject to ownership as physical or corporeal property, separate and apart from the ownership of the land itself. I take it, therefore, that Mr. Justice Overton would be as apt to adhere to the judicial opinion which he has already formed and expressed, and adhere to the well-established jurisprudence upon which his opinion was founded, as to adopt a contrary opinion, without anything new in the way of light upon the subject.

For the foregoing reasons, and for the reasons expressed in the original opinion which we handed down in this case, I do not concur in either the opinion submitted by the Chief Justice or in the opinion submitted by Mr. Justice PROVOSTY, proposing to reverse our former opinion and decree in this case and our previous jurisprudence on the subject.

### On Second Rehearing.

ST. PAUL, J. The issues involved herein have been fully stated in the several opinions heretofore filed herein, and need not be restated.

### I.

When the original opinion was handed down by Mr. Justice O'NIELL on January 5, 1920, this court then held for the *ninth* time that oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which they form part, and that a grant or reservation of such oil and gas carried only the right to extract such minerals from the soil.

It would serve no useful purpose to analyze the eight decisions which preceded; they have been gone into, first in that original opinion, and still more fully in the dissenting opinion handed down by the same justice on the first rehearing. Those eight cases are the following: (1) Wadkins v. Atlanta & Shreveport Oil Co., 1913, not reported; (2) Rives v. Gulf Refining Co., 133 La. 178, 62 South. 623; (3) Cooke v. Same, 135 La. 616, 65 South. 758; (4) Elder v. Ellerbe, 135 La. 995, 66 South. 337; (5) Strother v. Mangham, 138 La. 437, 70 South. 426; (6) Saunders v. Busch-Everett Co., 138 La. 1049, 71 South. 153; (7) Hanby v. Texas Co., 140 La. 190, 72 South. 933; (8) Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 South. 206, 5 A. L. R. 411.

It would therefore seem that, if a rule of property is ever to be established on that subject, those decisions should stand as law in this state.

### II.

[11] It is said that this court has held otherwise in De Moss v. Sample, 143 La. 243, 78 South. 482, and Calhoun v. Ardis, 144 La. 311, 80 South. 548. But we do not find it so; for an opinion is authority only in so far as the ratio dicendi is necessary for a decision of the precise issue involved in the case.

In the De Moss Case the vendors had reserved "the oil, gas and mineral rights in and to the property sold." The vendee contended that the deed conveyed the property in its entirety, because:

"The so-called reservation of mineral rights was of an uncertain thing, which could not be sold, and, if passed, was passed without consideration on the part of the defendants [vendors]."

The issues as stated above are taken from the opinion of the court (143 La. 245, 78 South. 482), and the only parts of the whole opinion which are at all pertinent to those issues are the following two paragraphs:

143 La. 245, 78 South. 483:

"The agreement entered into between the parties is clear and unambiguous in its terms. It therefore has the effect of a law upon them, and its terms must be performed in good faith, unless the agreement is in violation of law. As the law does not forbid the owner of land to reserve to himself the minerals lying under the surface thereof, or the right to thereafter enter upon said lands for the purpose of exploring for those minerals, such reservation properly became the subject, or motive, of the contract between the parties."

143 La. 249, 78 South. 484:

"A sale or reservation of the mineral rights on property, of course, does not constitute a sale or reservation of so many tons of coal, iron ore, barrels of oil, or feet of gas; nevertheless such a contract may convey or reserve the exclusive right to exploit the property for any of the minerals designated in the act of conveyance or reservation; and to say that such a contract is void for lack of certainty as to the thing sold, or reserved, or contrary to any principle of public policy of the state, would, in a way, relegate the most valuable property in the state to the category of property de hors commerce."

As to the alleged want of consideration, that received no notice whatever from the court, and deserved none.

All the rest of the opinion has nothing whatever to do with the case; and of course the parties to the suit were so little interested in the academic part of the opinion that they did not even apply for a rehearing.

In the Calhoun Case the vendor had retained "all the mineral rights under said property"; but the vendee claimed all the oil mined by the vendor on the ground:

That "no consideration passed from Ardis [the vendor] to plaintiff [the vendee] for said mineral rights; * * * that it is not legally possible to sell land separate from the oil and gas that might be beneath it, that the oil and gas attempted to be reserved cannot be identified and are not susceptible of private ownership until reduced to possession.'

To the first proposition the court answered:

"This reservation being of a thing that formed part of the estate, such part was excluded from the sale, and there could be no consideration due by Ardis * * * for that which, having never belonged to plaintiff, remained under the ownership of Ardis."

To the second proposition the court answered that the point had been set at rest in De Moss v. Sample, supra.

Neither of those cases called for any decision upon the question whether or not a sale of mineral rights (or, if gentlemen please, a sale of the minerals themselves) conveyed a corporeal thing or an incorporeal right; for in the De Moss Case the question raised was whether the thing reserved was certain and alienable; and we see how the court answered that. And in the Calhoun Case there was not the slightest suggestion that the defendant claimed title to anything but an incorporeal right, to wit—"all the mineral rights under said property," as stipulated in the deed.

These cases cannot therefore be considered as authority upon the point now before the court.

### III.

[12] We therefore hold that it is the settled jurisprudence of this state that oil and gas in place are not subject to absolute ownership as specific things apart from the soil of which they form part; and a grant or reservation of such oil and gas carries only the right to extract such minerals from the soil.

And we find with much satisfaction that our jurisprudence is in complete harmony

with that which prevails throughout the land.

The Supreme Court of the United States has so held at least four times: Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304; Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Walls v. Midland Carbon Co., 254 U. S. 300, 41 Sup. Ct. 118, 65 L. Ed. 276 (1920).

In Warvelle on the Law of Real Property, a book of elementary principles for students, we find:

"Section 32. *Oils and Gases.*—Earth oils and volatile gases occupy much the same position in the law of real property as water, and, like water, are not the subjects of property except while in actual occupancy. They are usually classed as minerals, possessing in some degree a kindred nature, and so long as they remain in place, are fully included in the comprehensive term 'land.' Unlike other minerals, however, they have the power as well as the tendency to escape without the volition of the owner, and in this respect they possess substantially the same attributes as water. Hence ownership therein partakes very much of the nature of an incorporeal interest, and a grant of oils or gases is practically no more than a mere license to sink shafts and extract same, and is governed by the general rules which apply to licenses"—citing Williams v. Gibson, 84 Ala. 228, 4 South. 350, 5 Am. St. Rep. 368; Stoughton's Appeal, 88 Pa. 198; Murray v. Allred, 100 Tenn. 100, 43 S. W. 355, 39 L. R. A. 249, 66 Am. St. Rep. 740; Westmoreland Gas Co. v. De Witt, 130 Pa. 235, 18 Atl. 724, 5 L. R. A. 731; People's Gas Co. v. Tyner, 131 Ind. 277, 31 N. E. 59, 16 L. R. A. 443, 31 Am. St. Rep. 433; Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891; Gerkins v. Kentucky Salt Co., 100 Ky. 734, 39 S. W. 444, 66 Am. St. Rep. 370; Kelley v. Ohio Oil Co., 57 Ohio St. 317, 49 N. E. 399, 39 L. R. A. 765, 63 Am. St. Rep. 721; Dark v. Johnston, 55 Pa. 164, 93 Am. Dec. 732.

In American and English Encyclopedia of Law (2d Ed.) vol. 21, p. 417, we find:

"Natural gas is not subject to absolute ownership; it belongs to the owner of the land and forms part of it, so long as it is on the land and subject to his control; but when it escapes and goes into other land, or comes under the control of another, the title of the former owner is lost"—citing People's Gas Co. v. Tyner, 131 Ind. 281, 31 N. E. 59, 16 L. R. A. 443, 31 Am. St. Rep. 433; Townsend v. State, 147 Ind. 628, 47 N. E. 19, 37 L. R. A. 294, 62 Am. St. Rep. 477; State v. Ohio Oil Co., 150 Ind. 30, 49 N. E. 809, 47 L. R. A. 627 (see 177 U. S. Supra); Westmoreland Nat. Gas Co. v. De Witt, 130 Pa. St. 235, 18 Atl. 724, 5 L. R. A. 731; Wood County Pet. Co. v. W. Va. Transportation Co., 28 W. Va. 210, 57 Am. Rep. 659.

In Ruling Case Law, vol. 18, p. 1206, verbo "Mining," § 110, we find:

"The owner of land has no specific title to them (oil and gas) until they have been removed from the earth, or reduced to actual possession"—citing Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; State v. Ohio Oil Co., 150 Ind. 21, 49 N. E. 809, 47 L. R. A. 627; Rupel v. Ohio Oil Co., 176 Ind. 4, 95 N. E. 225, Ann. Cas. 1913E, 836; Dark v. Johnston, 55 Pa. 164, 93 Am. Dec. 732; Bender v. Brooks, 103 Tex. 329, 127 S. W. 168, Ann. Cas. 1913A, 559; Smith v. Root, 66 W. Va. 633, 66 S. E. 1005, 30 L. R. A. (N. S.) 176.

In the very latest work on the subject, "Oil and Gas Rights" by R. S. Morrison and Emilio De Soto, of the Colorado bar, published by the Bender-Moss Company of San Francisco, and copyrighted in 1920, the authors say in their preface:

"It is intended to set forth the latest decisions and principles concerning the rights of the owner in fee of lands not affected by the act [of Congress] containing oil and gas deposits, the rights of lessors and lessees of oil and gas lands, and of all persons who have contractual relations concerning the same, and to treat upon the various topics and subjects incident to the laws governing the owning, leasing, production, sale, and transportation of oil and gas, with the latest text of the statutes of the different states which have legislated upon oil and gas rights."

Therein we find the following (page 20):

"In a case in Pennsylvania considering the fugacious nature of oil and gas, they were compared to animals feræ naturæ, the property in which does not become absolute until they

are reduced to possession. Westmoreland, etc., Natural Gas Co. v. De Witt, 130 Pa. 235, 249, 18 Atl. 724, 5 L. R. A. 731. * * *

"This precedent has been followed in numberless cases until it has beome a rule of property, and it is entirely too late to question it. We have nevertheless never yielded our assent to the logic of the analogy or the distinction which it forces into the law. It has led in its application to novel if not startling decisions. The whole subject of drainage and protection is affected by it as well as many questions of pleading and practice."

And as basis of the foregoing the authors cite the following: McNish v. Stone, 152 Pa. 457, and note; Venture Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732; Florence Oil Co. v. Orman, 19 Colo. App. 79, 73 Pac. 628; Kolachny v. Galbreath, 26 Okl. 772, 110 Pac. 902, 38 L. R. A. (N. S.) 451; Beardsley v. Kansas N. Gas Co., 78 Kan. 571, 96 Pac. 859; Kelly v. Keys, 213 Pa. 295, 62 Atl. 911, 110 Am. St. Rep. 547; Priddy v. Thompson, 204 Fed. 955, 123 C. C. A. 277; Lindlay v. Raydure (D. C.) 239 Fed. 928; Rich v. Doneghey (Okl.) 177 Pac. 86, 3 A. L. R. 352; Frank Oil Co. v. Belleview Gas Co., 29 Okl. 719, 119 Pac. 260, 43 L. R. A. (N. S.) 487; Campbell v. Smith, 180 Ind. 159, 101 N. E. 89; Louisville Gas Co. v. Kentucky Heating Co., 132 Ky. 435, 111 S. W. 374; Gillespie v. Fulton Oil Co., 239 Ill. 326, 88 N. E. 192; Poe v. Ulrey, 233 Ill. 56, 84 N. E. 46; Dark v. Johnston, 55 Pa. 164, 93 Am. Dec. 732; Wagner v. Mallory, 169 N. Y. 501, 62 N. E. 584; Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729; Mfrs' Gas Co. v. Indiana, 155 Ind. 461, 57 N. E. 912, 50 L. R. A. 768; Heller v. Dailey, 28 Ind. App. 555, 63 N. E. 490; New American Oil Co. v. Troyer, 166 Ind. 402, 76 N. E. 253, 77 N. E. 739; Bryson v. Crown Oil Co., 185 Ind. 156, 112 N. E. 1; Brookshire Oil Co. v. Casmalia Ranch Oil Co., 156 Cal. 211, 103 Pac. 927; Lanyon Zinc Co. v. Freeman, 68 Kan. 691, 75 Pac. 995, 1 Ann. Cas. 403; Brown v. Spilman, 155 U. S. 665, 670, 15 Sup. Ct. 245, 39 L. Ed. 304.

It will be observed that the authors are not friendly to the doctrine which these cases hold, but they do not pretend that there is even a single decision holding to the contrary; and they concede, though ungracefully, that—

"This precedent has been followed in numberless cases until it has become a rule of property and it is entirely too late to question it."

IV.

The famous and much-criticized comparison between oil and gas and animals feræ naturæ in Westmoreland Gas Co. v. De Witt, 130 Pa. 235, 18 Atl. 724, 5 L. R. A. 731, is in full as follows:

"Gas, it is true, is a mineral; but it is a mineral with peculiar attributes, which require the application of precedents arising out of ordinary mineral rights, with much more careful consideration of the principles involved than of the mere decisions. Water also is a mineral; but the decisions in ordinary cases of mining rights, etc., have never been held as unqualified precedents in regard to flowing, or even to percolating, waters. Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals feræ naturæ. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their 'fugitive and wandering existence within the limits of a particular tract is uncertain,' as said by Chief Justice Agnew, in Brown v. Vandegrift, 80 Pa. 147, 148. They belong to the owner of the land, and are part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone."

This incidental comparison of oil and gas with animals feræ naturæ was unfortunate and has afforded a powerful weapon to those who seek to overthrow the irresistible logic of a great decision. For, as said by Mr. Justice Provosty in Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 246, 82 South. 206, 211 (5 A. L. R. 411):

"The analogy between the subterranean oil and subterranean or percolating waters is, we believe, near complete. * * *"

But ridicule is indeed a powerful weapon for destruction, though without constructive value whatever, and hence is always appealed to by those who would overthrow a principle, but are unable to do so by force of logic.

### V.

[13] As to the nature of the right reserved, we liken it to the right to draw water from another's land; and that is a right of servitude. But we think it would be unprofitable to discuss generally whether such a right can or cannot be established in favor of a person *and his heirs*. For this much is certain, that many such grants and reservations of oil and mineral rights have been made in this state, whether under the name of leases or otherwise, and we will not disturb valuable rights, acquired in good faith and for valuable consideration, without being able to point out conclusively that such contracts are forbidden by law; and this, we confess, we are unable, as we are unwilling, to do.

We may hold, and we do hold, that no matter what the intention of the parties be, the owner of lands cannot convey or reserve the ownership of the oils, gases, and waters therein apart from the land in which they lie; and we so hold, because the owner himself has no absolute property in such oils, gases, and waters, but only the right to draw them through the soil and thereby become the owner of them. The intention of the parties has therefore nothing whatever to do with that holding; the principle involved being that no one can convey to another any greater right than he himself has.

But, in the matter of burdening his lands with some real obligation in favor of a person and his heirs, there is not the least doubt that the owner can do so unless some positive law prohibits it.

Now the right to establish a servitude in favor of a person *and his heirs* seems to be

forbidden by C. C. arts. 646, 709. But, on the other hand, it seems to be allowed by C. C. arts. 607, 758, 2013.

And with these conflicting provisions before us we cannot say that the law clearly prohibits the creation of a servitude upon lands in favor of a person *and his heirs*. And hence the intention of the parties should govern in such matters.

We therefore hold that the right granted or reserved in such cases is a servitude, and hence prescribed by nonuser for 10 years.

### Decree.

The decree herein first rendered, to wit, on January 5, 1920, is therefore now reinstated and made the final judgment of the court.

PROVOSTY, C. J., and LAND and BAKER, JJ., dissent.